STERLING v. REGENTS OF UNIVERSITY OF MICHIGAN.

1. MANDAMUS—PUBLIC BOARDS—PARTIES.

A private citizen does not possess the right, without permission of the court, to apply for a writ of *mandamus* to compel a public board to perform an omitted duty. ·

2. STATE UNIVERSITY—POWER OF LEGISLATURE OVER BOARD OF REGENTS—CONSTRUCTION OF CONSTITUTION.

The effect of sections 2, 6, 7, and 8 of article 13 of the Constitution, providing, *inter alia*, that "the board of regents shall have the general supervision of the University, and the direction and control of all expenditures from the University interest fund," is to vest in the regents direct and exclusive supervision and control; and the legislature, therefore, does not possess the power, attempted to be exercised by Act No. 257, Pub. Acts 1895, to compel the discontinuance of the existing homeopathic medical college at Ann Arbor, and its re-establishment at Detroit.[1]

3. SAME.

The following considerations bear upon such construction:

(*a*) The reports of committees appointed by the legislature prior to the adoption of the Constitution of 1850, when the institution was under direct legislative control, favoring the vesting of exclusive control in a permanent board.

(*b*) Reports of regents appointed by the legislature, and acting under its supervision, urging a restriction of responsibility to the board.

(*c*) Discussions and debates in the constitutional convention.

(*d*) The report of the superintendent of public instruction, immediately thereafter, referring to the "change of the organic law in placing the University under the control of regents."

(*e*) The open assertion by the regents since the adoption of the Constitution of the right of exclusive control.

---

[1] The decisions as to the nature of incorporated institutions belonging to the State are found in a note to *State, ex rel. Little,* v. *Board of Regents of University*, (Kan.) 29 L. R. A. 378.

110 MICH.—24.

(*f*) Decisions of the courts substantially sustaining the regents in such contention.

4. SAME.

The Constitution itself is ample evidence that such is the proper construction:

(*a*) Direct powers are conferred upon the board of regents by the Constitution, which, in the absence of language showing a contrary intent, excludes the exercise of such powers by any other constitutional body.

(*b*) The board of regents is the only corporation provided for in the Constitution whose powers are defined therein, the powers of all other corporations being such as the legislature shall confer.

(*c*) The effect of sections 1 and 9 of article 13, which, after conferring certain power of "general supervision" upon the superintendent of public instruction and the State board of education, respectively, provide that their duties shall be "prescribed by law," is to exclude such restriction upon the power of the board of regents, under the rule that where a general power over one subject is conferred upon one body in one clause of an instrument, without any restricting or qualifying language, and the like power over another subject is conferred upon another body in another clause of the same instrument, *with* restricting or qualifying language, such restrictions or qualifications must be excluded from the first clause.

*Mandamus* by Charles F. Sterling to compel the Regents of the University of Michigan to comply with Act No. 257, Pub. Acts 1895, providing for the removal of the homeopathic medical college from Ann Arbor to Detroit. Submitted May 5, 1896. Denied July 28, 1896.

In 1895 the legislature passed Act No. 257, Pub. Acts 1895, the material part of which reads as follows:

"That the board of regents of the University of Michigan are hereby authorized and directed to establish a homeopathic medical college as a branch or department of said University, which shall be located in the city of Detroit, and the said board of regents are hereby authorized and directed to discontinue the existing homeopathic medical college now maintained in the city of Ann Arbor as a branch of said University, and to transfer the same to the city of Detroit."

The title of the act is "An act to amend section one of an act entitled 'An act for the establishment of a homeopathic medical department of the University of Michigan,' approved April 27, 1875, being section 4932 of Howell's Annotated Statutes." The regents of the University declined to comply with said act. The relator thereupon presented this petition for the writ of *mandamus* to compel the regents to comply with the act. The ground for such refusal is (1) that it was not, in their judgment, for the best interests of the University; (2) that the legislature has no constitutional right to interfere with or dictate the management of the University. Among other things in their answer, they say:

"A large part of the course of instruction required to be given in the other medical department of the University, and in the homeopathic medical college, is common to the two schools. This fact has enabled the regents to provide for such common instruction at the expense, to that extent, of the support and maintenance of a single department; thus saving to the benefit of the University and to the people of the State a large sum of money annually, which otherwise would be required for the continuous support of two medical departments, which would be wholly separate throughout their several courses of instruction in case both departments of medicine were not located at the city of Ann Arbor. It appears to the regents that great advantage arises to the University as a whole, and to the students in the various departments of the University, that all the branches of the University are located and maintained at the proper seat of the University, at Ann Arbor. It appears also to the regents that whatever suggestions may be made of the advantages to be derived to the homeopathic medical college, as a department of the University, by the removal of such department to a larger city, or to any other locality than the city of Ann Arbor, are suggestions which may, perhaps, be used for the removal of the other medical department of the University and other departments of the University to some other locality than the city of Ann Arbor, by parties or interests desiring to secure such removal. It further appears to the regents that the

removal of one of the established departments of the University suggests a movement for an entire change in that policy of concentration of the departments of the University at the proper seat of the University which has hitherto promoted the growth and advancement of the University to its present place among the great schools of the world.

"The claim which is made under the application of the relator, that the provisions of Act No. 257 command the discontinuance and removal of the homeopathic medical department of the University by the regents, without any reference to their power of supervision of the University, suggests to the regents the question whether such provisions do not curtail and impair the power of supervision and control of the University which has been vested in the regents by the Constitution of the State. It is the purpose, as well as the plain duty, of the regents, to exercise, according to their best judgment, the supervision and control of the University, which has been vested in them by the State Constitution, to promote both the interests of the University and the interests of the people of the State, which are involved in the welfare of the University. The regents have not undertaken to decide for themselves upon the wisdom or unwisdom of the purpose of the provisions of said Act No. 257, under which the relator's application is made. They have been advised that grave doubts exist in respect to the validity of said act. They have also been advised that to the extent that the provisions of the act are a foundation for the application for a writ to compel action on the part of the regents, denying their right to exercise judgment, supervision, or control in relation to the subject of the discontinuance of an existing department of the University, there are grave doubts in respect to the validity of the act."

*Geer & Williams*, for relator.

*Hanchett & Hanchett* (*B. F. Graves*, of counsel), for respondent board.

GRANT, J. (*after stating the facts*). 1. The petitioner does not in his petition show any interest in the matter, or the right to question the action of the board of regents. The attorney general is the proper party to move in such a case, and a private citizen does not pos-

sess the right, without permission of the court, to apply for this writ to compel a public board to perform an omitted duty. *People* v. *Regents of University of Michigan,* 4 Mich. 98. The petition in this case does not set forth that the petitioner is a citizen of the State, or that he is in any manner injured by the action of the board. This point is not raised in the briefs of counsel, probably because it is desired to obtain a decision upon the merits. We think that such proceedings should be instituted by proper parties, and that relators should show themselves competent to bring them into court. Inasmuch, however, as the question has not been raised, we shall do as we have sometimes done before,—dispose of the case upon the main issue.

2. The University of Michigan was founded under an act of Congress making an appropriation of lands for the support of a university in this State, approved May 20, 1826. In 1836 an act of Congress was passed in which it was provided:

"That the 72 sections of land set apart and reserved for the use and support of a university by an act of Congress approved May 20, 1826, are hereby granted and conveyed to the State, to be appropriated solely to the use and support of such university." 5 U. S. Stat. at Large, 59.

This grant of lands was accepted by the State by an act of legislature approved July 25, 1836.

By the Constitution of 1835 (article 10, § 5) it was provided:

"The legislature shall take measures for the protection, improvement, or other disposition of such lands as have been or may hereafter be reserved or granted by the United States to this State for the support of a university, and the funds accruing from the rents or sale of such lands, or from any other source for the purpose aforesaid, shall be and remain a permanent fund for the support of said university, with such branches as the public convenience may hereafter demand for the promotion of literature, the arts and sciences, and as may be authorized by the

terms of such grant. And it shall be the duty of the legislature, as soon as may be, to provide effectual means for the improvement and permanent security of the funds of said university."

By subsequent acts of the legislature, the lands were sold, and the State received the proceeds, and they were made a permanent fund for the support of the University. In 1837 the University was located at Ann Arbor, upon a tract of land donated for that purpose. Laws 1837, p. 142. The same legislature passed an act establishing the University, providing for a board of regents of 12 members, for 3 departments, and for the establishment of professorships. It also provided that the regents, together with the superintendent of public instruction, should establish such branches of the University in the different parts of the State as should from time to time be authorized by the legislature; also, for the establishment, in connection with each branch, of an institution for the education of females in the higher branches of knowledge, whenever suitable buildings should be prepared; and also for a department of agriculture. Laws 1837, p. 102.

Under the Constitution of 1835, the legislature had the entire control and management of the University and the University fund. They could appoint regents and professors, and establish departments. The University was not a success under this supervision by the legislature, and, as some of the members of the constitutional convention of 1850 said in their debates, "some of the denominational colleges had more students than did the University." Such was the condition of affairs when that convention met. It is apparent to any reader of the debates in this convention in regard to the constitutional provision for the University that they had in mind the idea of permanency of location, to place it beyond mere political influence, and to intrust it to those who should be directly responsible and amenable to the people. After these constitutional provisions, substantially in their present form, had been presented to the convention, and the

question arose as to how they should be selected, whether by election or appointment, Mr. Whipple said:

"If we select eight (and I should prefer twelve), your regents will be distributed over every part of the State, and the public will thus obtain a knowledge of this insti- tution; *for the convention will observe that the con- cerns of this University are to be placed in the hands of the regents.* They will obtain very important knowl- edge in regard to this establishment, and the people among whom they live will become informed as to the nature of this institution, and will become interested in it." Convention Debates, 782.

The public men of those times were greatly interested in the University. Methods for its management were discussed by governors in their messages, by reports of the board of regents to the legislature, and by commit- tees of the legislature. The general consensus of opinion was that it should be under the control and management of a permanent board, who should be responsible for its management. The regents, in March, 1840, in obedience to a joint resolution of the legislature, reported that—

"The first change in the organic law deemed essential is the *proper restriction of responsibility to the board of regents.* At present the responsibility is divided, and the board would be greatly facilitated in their action were such amendments made as would throw entire responsibility on them."

In the same report they also urged that the trust and management of the funds of the University should be placed in the regents.

A select committee was appointed by the legislature in 1840 to inquire into the condition of the University. No more forcible argument could well be made than is found in that report for placing the entire control of the Uni- versity in the hands of a permanent board, and taking it away from the legislature. 2 House Documents 1840, p. 470. I quote from that report as follows:

"No *State* institution in *America* has prospered as well as independent colleges with equal, and often with

less, means. Why they have not may be ascribed, in part, to the following causes: They have not been guided by that oneness of purpose and singleness of aim (essential to their prosperity) that *others* have whose trustees are a permanent body,—men chosen for their supposed fitness for *that very office,* and who, having become acquainted with their duties, *can* and are *disposed* to pursue a *steady* course, which inspires confidence and insures success, to the extent of their limited means. *State* institutions, on the contrary, have fallen into the hands of the several legislatures, fluctuating bodies of men, chosen with reference to their supposed qualifications for *other* duties than cherishing literary institutions. When legislatures have legislated directly for colleges, their measures have been as *fluctuating* as the changing materials of which the legislatures were composed. When they have acted through a board of trustees, under the show of giving a representation to *all,* they have appointed men of such *dissimilar* and *discordant* characters and views that they never could act in *concert;* so that, whilst supposed to act for and represent *everybody,* they, in fact, *have* not and *could* not act for *anybody.*

"Again, legislatures, wishing to retain all the power of the State in their own hands, as if they alone were competent or disposed to act for the general good, have not been willing to appoint trustees for a length of time sufficient for them to become acquainted with their duties, to become interested in the cause which they were appointed to watch over, and feel the deep responsibility of the trust committed to them. A new board of trustees, like a legislature of new members, not knowing well what to do, generally begins by undoing and disorganizing all that has been done before. At first they dig up the seed a few times, to see that it is going to come up; and, after it appears above the surface, they must pull it up, to see that the roots are sound; and they pull it up again, to see if there is sufficient root to support so vigorous branches; then lop off the branches, for fear they will exhaust the root; and then pull it up again, to see why it looks so sickly and pining, and finally to see if they can discover what made it die. And, as these several operations are performed by successive hands, no one can be charged with the guilt of destroying the valuable tree. Whilst State institutions have been, through the jealousy of State legislatures, thus sacrificed to the impa-

tience and petulance of a heterogenous and changeable board of trustees, whose term of office is so short that they have not time to discover their mistakes, retrace their steps, and correct their errors, it is not surprising that State universities have hitherto, almost without exception, failed to accomplish, in proportion to their means, the amount of good that was expected from them, and much less than colleges in their neighborhood, patronized by the religious public, watched over by a board of trustees of similar qualifications for duty, and holding the office permanently, that they may profit by experience.

"The argument by which legislatures have hitherto convinced themselves that it was their duty to legislate universities to death is this: 'It is a State institution, and we are the direct representatives of the people, and therefore it is expected of us; it is our right. The people have an interest in this thing, and we must attend to it.' As if, because a university belongs to the people, that were reason why it should be dosed to death for fear it *would* be sick, if left to be nursed, like other institutions, by its immediate guardians. Thus has State after State, in this American Union, endowed universities, and then, by repeated contradictory and over legislation, torn them to pieces with the same facility as they do the statute book, and for the same reason, because they have the right."

All these reports and discussions were undoubtedly known to the members of the convention, and their action should be construed in the light of such knowledge. I am unable to find a single utterance by any member of that convention from which it could be inferred that the members believed or supposed that they were leaving the control of that institution to the legislature. The result has proved their wisdom, for the University, which was before practically a failure, under the guidance of this constitutional body, known as the "Board of Regents," has grown to be one of the most successful, the most complete, and the best-known institutions of learning in the world. That such was the understanding of the meaning of the Constitution of 1850 is shown by the report of the superintendent of public instruction, published in 1852, in which he refers to "the additional and general interest created

by a change of the organic law in 1850, in placing the University *under the control of regents elected by the people.*" Report, Pub. Ins. 1852, p. 26.

The provisions of the Constitution of 1850 in regard to the University are these (article 13):

"Sec. 2.    The proceeds from the sales of all lands that have been or hereafter may be granted by the United States to the State for educational purposes, and the proceeds of all lands or other property given by individuals or appropriated by the State for like purposes, shall be and remain a perpetual fund, the interest and income of which, together with the rents of all such lands as may remain unsold, shall be inviolably appropriated and annually applied to the specific objects of the original gift, grant, or appropriation."

"Sec. 6. There shall be elected in the year 1863, at the time of the election of a justice of the Supreme Court, eight regents of the University, two of whom shall hold their office for two years, two for four years, two for six years, and two for eight years.    They shall enter upon the duties of their office on the first of January next succeeding their election.    At every regular election of a justice of the Supreme Court thereafter, there shall be elected two regents, whose term of office shall be eight years. When a vacancy shall occur in the office of regent, it shall be filled by appointment of the governor.    The regents thus elected shall constitute the board of regents of the University of Michigan.

"Sec. 7. The regents of the University, and their successors in office, shall continue to constitute the body corporate known by the name and title of 'the Regents of the University of Michigan.'

"Sec. 8. The regents of the University shall, at their first annual meeting, or as soon thereafter as may be, elect a president of the University, who shall be *ex officio* a member of their board, with the privilege of speaking, but not of voting.    He shall preside at the meetings of the regents, and be the principal executive officer of the University.    The board of regents shall have the general supervision of the University, and the direction and control of all expenditures from the University interest fund."

The board of regents, elected under the new Constitution, immediately took control of the University, interpreted the Constitution in accordance with its plain provisions, denied the power of the legislature to interfere with its management or control, and for 46 years have declined obedience to any and every act of the legislature which they, upon mature reflection and consideration, have deemed against the best interests of the institution. This court has sustained them in that position, and has on every occasion when asked denied its writ to interfere with their action.    In January, 1856, in the case of *People* v. *Regents of University of Michigan*, 4 Mich. 98, this court, in denying the writ of *mandamus* to compel the regents to establish a professorship authorized by the legislature, said:

"They [the regents] aver that they have acted in good faith, but at the same time under the influence of much uncertainty as to the constitutionality of the law, and we are compelled to recognize in this question what might well suggest doubt of the binding force of the law, and occasion some hesitation in their action."

Obviously, it was not the intention of the framers of the Constitution to take away from the people the government of this institution.    On the contrary, they designed to, and did, provide for its management and control by a body of eight men elected by the people at large.    They recognized the necessity that it should be in charge of men elected for long terms, and whose sole official duty it should be to look after its interests, and who should have the opportunity to investigate its needs, and carefully deliberate and determine what things would best promote its usefulness for the benefit of the people.    Some of the members of the convention of 1850 referred in the debates to two colleges (one in Virginia and the other in Massachusetts) which had been failures under the management by the State.    It is obvious to every intelligent and reflecting mind that such an institution would be safer and more certain of permanent success in the con-

trol of such a body than in that of the legislature, composed of 132 members, elected every two years, many of whom would, of necessity, know but little of its needs, and would have little or no time to intelligently investigate and determine the policy essential for the success of a great university.

Now, in the face of the facts that the regents have for 46 years exercised such control, and openly asserted their exclusive right to do so; that the courts have refused to compel them to comply with the acts of the legislature; that this court held in *Weinberg* v. *Regents*, 97 Mich. 246, that they were a constitutional body, upon whom was conferred this exclusive control; and in the face of this plain constitutional provision,—this court is now asked to hold that the regents are mere ministerial officers, endowed with the sole power to register the will of the legislature, and to supervise such branches and departments as any legislature may see fit to provide for. By the power claimed, the legislature may completely dismember the University, and remove every vestige of it from the city of Ann Arbor. It is no argument to say that there is no danger of such a result. The question is one of power, and who shall say that such a result may not follow? The legislature did once enact that there should be a branch of the University in every judicial circuit. If the regents comply with the present act, the next legislature may repeal it, and restore that department to the University at Ann Arbor, or place it elsewhere. Some legislatures have attached conditions—and they have the undoubted right to do so—to appropriations for the support of the University, and a subsequent legislature has removed the conditions. Some legislatures have attached to appropriations the condition for the establishment of a homeopathic professorship in the old medical department. Other legislatures have refused to attach any such condition. What permanency would there be in an institution thus subject to the caprice and will of every legislature? Under this power, the legislature could

remove the law department from the University at Ann Arbor to Detroit, and provide that the law library, to which one citizen of Michigan has donated $20,000, should also be removed. It might scatter its great library (to the collection of which private citizens have contributed nearly or quite one-half), and also its great museums, laboratories, and mechanical appliances. Other results will readily suggest themselves. It appears to us impossible that such a power was contemplated.

Furthermore, it renders nugatory the express provision of the Constitution that "the regents shall have the direction and control of all expenditures from the University interest fund." It is significant that, at the time of the adoption of the Constitution, this fund constituted the sole support of the University, aside from fees which might be received from students. The State had made no appropriations for its support, and there is nothing to indicate that any such appropriations were contemplated. It is unnecessary to argue that the above provision means what it says, and that it takes away from the legislature all control over the income from that fund. The power therein conferred would be without force or effect if the legislature could control these expenditures by dictating what departments of learning the regents shall establish, and in what places they shall be located. Neither does it need any argument to show that the power contended for would take away from the regents the control and direction of the expenditures from the fund. The power to control these expenditures cannot be exercised directly or indirectly by the legislature. It is vested in the board of regents in absolute and unqualified terms. This act, in express terms, prohibits the regents from using any of this fund to support a homeopathic department at the University at Ann Arbor, since it prohibits them from maintaining such a department there.

This power cannot be sustained without overruling the case of *Weinberg* v. *Regents.* The basis of the majority opinion in that case is that the board of regents is a con-

stitutional body, charged by the Constitution with the entire control of that institution. The result could not have been reached upon any other basis. It was held not to be a State institution under the control and management of the legislature, as were the other corporations enumerated in the statute then under discussion. We there said: "Under the Constitution, the State cannot control the action of the regents. It cannot add to or take away from its property without the consent of the regents." We might with propriety rest our decision upon that case, and should be disposed to do so were it not for the urgent contention of the counsel on the part of the relator that that case does not apply. We are therefore constrained to state some further reasons to show that the legislature has no control over the University or the board of regents.

(1) The board of regents and the legislature derive their power from the same supreme authority, namely, the Constitution. In so far as the powers of each are defined by that instrument, limitations are imposed, and a direct power conferred upon one necessarily excludes its existence in the other, in the absence of language showing the contrary intent. Neither the University nor the board of regents is mentioned in article 4, which defines the powers and duties of the legislature; nor in the article relating to the University and the board of regents is there any language which can be construed into conferring upon or reserving any control over that institution in the legislature. They are separate and distinct constitutional bodies, with the powers of the regents defined. By no rule of construction can it be held that either can encroach upon or exercise the powers conferred upon the other.

(2) The board of regents is the only corporation provided for in the Constitution whose powers are defined therein. In every other corporation provided for in the Constitution it is expressly provided that its powers shall be such as the legislature shall give. In the case of townships (article 11, § 2), and in counties (article 10,

§ 1), and boards of supervisors (article 10, § 6), it is expressly provided that each corporation shall have such powers and immunities as shall be prescribed by law. The same is true of other officers, aside from the regents, provided for in the Constitution. Justices of the peace (article 6, § 18), the sheriff, the county clerk, the county treasurer, the register of deeds, and prosecuting attorney (article 10, § 3), and township officers (article 11, § 1), can exercise such powers as shall be prescribed by law.

(3) Let us apply another test. It is a rule of construction that where a general power over one subject is conferred upon one body in one clause of an instrument, without any restricting or qualifying language, and the like power over another subject is conferred upon another body in another clause of the same instrument, with restricting or qualifying language, the restrictions or qualifications of the second clause cannot be read into the first clause. On the contrary, they must be excluded. By article 13, § 1, the superintendent of public instruction is clothed with "the general supervision of public instruction;" but it is added, "His duties shall be prescribed by law." By article 13, § 9, the board of education is given "the general supervision of the State Normal School;" but it is added, "Their duties shall be prescribed by law."

Thus, in every case except that of the regents, the Constitution carefully and expressly reposes in the legislature the power to legislate and to control and define the duties of those corporations and officers. Can it be held that the framers of the Constitution, and the people, in adopting it, had no purpose in conferring this power, viz., the "general supervision," upon the regents in the one instance, and in restricting it in the others? No other conclusion, in my judgment, is possible than that the intention was to place this institution in the direct and exclusive control of the people themselves, through a constitutional body elected by them. As already shown, the maintenance of this power in the legislature would give

to it the sole control and general supervision of the institution, and make the regents merely ministerial officers, with no other power than to carry into effect the general supervision which the legislature may see fit to exercise, or, in other words, to register its will. We do not think the Constitution can bear that construction.

The writ is denied.

LONG, C. J., MONTGOMERY and HOOKER, JJ., concurred with GRANT, J. MOORE, J., concurred in the result.