STATE BOARD OF AGRICULTURE *v.* AUDITOR GENERAL.

1. COLLEGES AND UNIVERSITIES — MICHIGAN STATE AGRICULTURAL COLLEGE—BOARD OF AGRICULTURE—STATUTES.

 The provisions of section 1*a* of Act No. 324, Pub. Acts 1913, providing that no part of the appropriation granted by this act or of any other appropriation for the Michigan agricultural college should be available in case a sum in excess of $35,000 from any or all sources should be expended in any one fiscal year for the maintenance of the mechanical and engineering department, are to be construed as limiting the expenditures for the maintenance of the department specified to $35,000 and to make unavailable for college purposes all of its funds in case the maximum named should be exceeded.

2. SAME—CONSTRUCTION OF STATUTES.

 While the act might stand without this provision if the clause was intended as merely admonitory, the language is not so construed, but is *held* to have been intended as a controlling limitation.

3. CONSTITUTIONAL LAW—COLLEGES—MICHIGAN AGRICULTURAL COLLEGE.

 Under the Constitution, art. 11, §§ 10 and 11, the legislature is required to maintain the agricultural college, and by section 8, the State board of agriculture is given control and supervision of its funds, so that it exceeded the power of the legislature to limit the amount which the board of agriculture might expend to maintain the engineering and mechanical department. Act No. 324, Pub. Acts 1913.

4. SAME—TAXATION.

 The statute being invalid, its provisions for increasing the tax for the benefit of the college to one-sixth of a mill must be declared ineffectual, and it is *held*, that the conditions of section 1*a* were so mutually connected with and dependent on the remainder of the law as to invalidate the entire act.

Mandamus by the State board of agriculture against Oramel B. Fuller, auditor general, to compel respond-

ent to draw certain warrants on the State treasurer. Submitted April 7, 1914. (Calendar No. 26,187.) Writ granted May 29, 1914.

*Stevenson, Carpenter, Butzel & Backus (Beaumont, Smith & Harris*, of counsel), for relator.

*Grant Fellows*, Attorney General, and *L. W. Carr*, Assistant Attorney General, for respondent.

Under the Constitution and laws of the State, money may be drawn from the State treasury only upon the warrant of the auditor general. On the 23d of March last the auditor general declined to draw warrants for certain sums asked for by the State board of agriculture, basing his action upon the legislative declaration found in Act No. 324 of the Public Acts of 1913, which appropriates and orders to be levied for the use of the agricultural college, in the year 1913 and thereafter, annually one-sixth of a mill on each dollar of the taxable property in the State, and concludes as follows:

"SEC. 1 (*a*). No part of this or any other appropriation shall be available in case a sum in excess of thirty-five thousand dollars from any or all sources, shall be expended in any one fiscal year for the maintenance of the mechanical and engineering department."

When the warrants were refused, a sum in excess of the requisitions stood credited to the agricultural college fund. Requisitions previously honored advised the auditor general that a sum in excess of $35,000 had been expended in maintaining the mechanical and engineering department of the college since June 30, 1913.

The State board of agriculture filed its petition for an order requiring the auditor general to draw the refused warrants and such others as it might be entitled to. The auditor general made answer, and,

upon the petition and answer, there being no disputed facts, the matter has proceeded to a hearing. It is asserted, in concluding the petition, that, if the auditor general's construction of the act of 1913 is the correct one, it prevents relator's performing duties imposed by the Federal statutes and those imposed upon it by the Constitution of the State; that the appropriation, in view of the condition, is not one which it is free to accept or reject. It cannot reject the appropriation without disobeying constitutional mandates; it cannot accept it and perform the condition without denying itself the exercise of constitutional powers. The condition is not within the title of the act. The act may be construed to limit the expenditure of moneys raised by taxation and appropriated by the act, in which case it has been complied with. If it may not be so construed, the condition is altogether unconstitutional, and relator is entitled to receive the appropriation.

In behalf of the respondent auditor general the attorney general contends that:

"An examination of the conditions found in section 1 (*a*) of the act under consideration demonstrates that the provisions are in no wise ambiguous, and there can be no serious question as to the purpose of the legislature in attaching this condition. Undoubtedly it was the same purpose that prompted the condition attached in the regents' case involving the homeopathy department. It is not a question for this Court, we respectfully submit, nor is it a question for the administrative officers of the State, whether the agricultural college shall continue as a competitor against another institution maintained at State expense of over $200,000 per year; nor is it a question for this Court or the administrative officers of the State whether this legislation is wise in policy or not; nor is it a question, we respectfully submit, for relator board to determine. The money in the treasury of the State was the property of the State; none of it was the property of the agricultural college until appropriated by the legislative branch of the State government. That branch of the State government has the

exclusive control of appropriations to State institutions, and may prescribe the amount and condition upon which any of the public institutions of the State can withdraw the same. If, in the wisdom of the legislature, it is inadvisable to continue two appropriations to two institutions which are duplicating work in the State, neither the courts, the administrative officers, or administrative boards can set aside such action.

"Relator understood clearly the conditions under which this appropriation was made; it understood clearly that, if the act was valid, its engineering department must be curtailed; and, while protesting against the power of the legislature to attack such conditions, it continued to make its requisitions upon the auditor general and to receive the money appropriated to it under this and other acts, and to use such money contrary to the conditions found in this act. The people, by the Constitution of 1908, gave to relator powers never before possessed by the controlling board of the agricultural college, the same powers exercised by the regents of the university, but they still reserved to their representatives chosen each two years the right to determine the appropriations to be made, not only to the other State institutions, but also to the university and the agricultural college. The respondent is but carrying out the conditions imposed under the act in question. Relator's present position, if unfortunate, arises from its failure to recognize that the legislature, and the legislature alone, holds the purse strings of the State."

To understand and to dispose of the contention presented, it is necessary to refer to facts appearing in the pleadings or evidenced by the Constitution of the State and Federal and State statutes. By the Constitution of 1909 the State board of agriculture is made, what before it was not, a constitutional board and body corporate. It is given general supervision of the college and direction and control of "all agricultural college funds." Article 11, § 8. Sections 10 and 11 of article 11 read, respectively, as follows:

"SEC. 10. The legislature shall maintain the uni-

versity, the college of mines, the State agricultural college, the State normal college, and such State normal schools and other educational institutions as may be established by law.

"SEC. 11. The proceeds from the sales of all lands that have been or hereafter may be granted by the United States to the State for educational purposes and the proceeds of all lands or other property given by individuals or appropriated by the State for like purposes shall be and remain a perpetual fund, the interest and income of which, together with the rents of all such lands as may remain unsold, shall be inviolably appropriated and annually applied to the specific objects of the original gift, grant or appropriation."

Agricultural college funds, when the Constitution was adopted, consisted of sums paid for tuition, receipts from sales of products of the institution, a grant of money by the Federal government, the interest paid by the State upon money received from sales of land granted by the Federal government (the proceeds of the sales having been covered into the State treasury), and, lastly, the proceeds of a tax of one-tenth of a mill levied annually upon the valuation of taxable property of the State pursuant to the provisions of Act No. 232 of the Public Acts of 1901 (4 How. Stat. [2d Ed.] § 9808). The condition attached to the Federal grant of lands was:

"That all moneys derived from the sale of the lands aforesaid by the States to which the lands are apportioned, and from the sales of land scrip hereinbefore provided for, shall be invested in stocks of the United States or of the States, or some other safe stocks, yielding not less than five per centum upon the par value of said stocks; and that the moneys so invested shall constitute a perpetual fund, the capital of which shall remain forever undiminished (except so far as may be provided in section fifth of this act), and the interest of which shall be inviolably appropriated, by each State which may take and claim the benefit of this act, to the endowment, support, and maintenance

180 MICH.—23.

of at least one college, where the leading object shall be, without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislature of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life."

And the Federal grants of money were made to the State for the more complete endowment and maintenance of such agricultural college as had been or might be established in accordance with the original land grant act. Formal acceptances of the Federal bounty were made by the legislature (Acts Nos. 46 and 140, Session of 1863; Act No. 80, Session of 1891), and it was formally devoted to the maintenance of the agricultural college. Including the interest paid by the State, the proceeds of Federal bounty amount to more than $120,000 annually. Although one purpose of the Federal grants was the teaching of mechanic arts, and instruction was in some degree afforded in mechanic arts, it was more than 20 years after the first grant was made before a mechanical department was established at the college. Act No. 42, Public Acts 1885. Since it was established, the State board of agriculture has been repeatedly expressly charged with the maintenance of the department. Section 15 of Act No. 188, Public Acts of 1861, an act which reorganized the college, provides a course of instruction as follows:

"The course of instruction shall embrace the English language and literature, mathematics, civil engineering, agricultural chemistry, animal and vegetable anatomy and physiology, the veterinary art, entomology, geology, and such other natural sciences as may be prescribed, technology, political, rural and household economy, horticulture, moral philosophy, history, bookkeeping, and especially the application of

science and the mechanic arts to practical agriculture in the field."

To refer to no other instances, in Act No. 232, Public Acts of 1901, is found the following condition:

"The Michigan State board of agriculture shall maintain at all times a sufficient corps of instructors in all the courses of study of the agricultural college as at present constituted, * * * the same being known as the agricultural department, the mechanical department and the woman's department; * * * and shall make a fair and equitable division of the funds provided by this act in accord with the wants and needs of said courses of study. * * * "

And the concluding language of the section is:

"Should the State board of agriculture fail at any time to maintain any of said departments as herein provided, the terms of this act shall be suspended until further action by the legislature."

The mechanical department has grown in importance until it now represents an investment of more than $227,000. To maintain it during the year ending June 30, 1913, there was expended $27,000 for supplies, machinery, and maintenance of buildings, and about $34,000 for salaries of professors and instructors.

Following the enactment of the law in question here and before any money had been drawn under it, the State board of agriculture made a statement in writing, copies of which were sent to the State officers, in which statement, after reviewing the history of the mechanical and engineering department of the college and the Federal and State legislation pertaining thereto, the following conclusions are set forth:

"The board is advised by reputable legal counsel, and it believes, that under the Constitution of the State, the legislature has no authority to enact the limiting provision hereinbefore first referred to, and especially that it had no power to limit or determine the use of the Federal funds. However, without in any

manner accepting the provisions of said limitation, and without waiving our right to insist upon its invalidity, we respectfully make the following declaration of our intention in reference to said mechanical and engineering department:

"(a) We shall continue that department as now conducted and as it may legitimately grow and develop.

"(b) We shall limit the annual expenditure of State funds in this department to $35,000.00.

"(c) For the remainder of the necessary expenditure we shall use a sufficient portion of the funds of the Federal government.

"(d) The secretary is instructed to mail certified copies of this statement, and the action of the board in reference thereto, to the governor, the auditor general, the State treasurer, the attorney general and to the president of the senate and the speaker of the house."

As matter of bookkeeping, the auditor general credits the agricultural college fund with all moneys belonging to it. During the fiscal year beginning July 1, 1913, and until the month of March, 1914, requisitions upon the fund were honored until a sum in excess of $400,000 had been paid upon the requests of the State board of agriculture, there remaining in the fund in March, 1914, when further demands were refused, a sum in excess of $190,000.

OSTRANDER, J. (after stating the facts). In attempting to find the meaning to be given to section 1 (a), it will be assumed that the legislature knew that, independent of the immediate appropriation, there was a fund already devoted to the needs of the college larger than any sum likely to be used to maintain the particular department. If the purpose was to limit the total sum which should be expended to maintain that department, it could not be accomplished by limiting the amount which might be taken from the immediate appropriation. If there was no

purpose to limit the total amount which might be expended, the provision is wholly insensible. In any event, the words "from any and all sources" may not be disregarded. Section 1 (*a*) cannot be held as intended merely to place a limitation upon the amount to be taken from the immediate appropriation to be used in maintaining the mechanical and engineering department.

While no reading and no analysis of the language employed leaves one entirely certain of the meaning of the provision, it seems most reasonable to say that the purpose was to limit expenditures for maintaining the particular department to $35,000 annually, and to make unavailable for the use of the college all of its funds in case the maximum thus fixed was exceeded. I do not overlook the language, "No part of this or any other appropriation shall be available," nor the actual occurrence of a result which was inevitable; namely, that unless the declaration of the relator board was to be accepted for the fact some part of the immediate and of other appropriations would of necessity be available, if the college was to continue to exist, since it could not be known before the fact whether relator would or would not expend more than $35,000 in maintaining the particular department. Some question might be raised also about the meaning of the words "or any other appropriation." The reference might be to an unexpended appropriation or the term "appropriation" used to designate, and not improperly, the earlier legislation which devoted the Federal gifts to the maintenance of the college. But I think we must say that the legislative purpose expressed in this statute is the one to which the respondent has given effect, and, assuming the law to be valid, respondent cannot be required to issue to relator further warrants for money.

We must either say this, or else conclude that section 1 (*a*) was added to the act as an admonition, and

not a command, or a condition; that it expresses the opinion of the legislature with respect to the manner in which the agricultural college funds shall be employed. If it was an admonition merely, the act could, of course, stand without it. Because of the language employed in section 1 (a) I do not feel warranted in concluding that it is admonitory only. It is therefore necessary to determine whether the legislature has, as it is claimed, exceeded its constitutional powers, and, if it has, then the state of the applicable law.

If section 1 (a) be held to be valid, its effect would be legislative supervision of the college. To determine that a department of the college which has been maintained at a cost of $60,000 annually for instructors and supplies ·shall be from a given date maintained at a cost of $35,000 annually for instructors and supplies is to determine that it shall have fewer supplies, or fewer, or less capable, instructors, or both. It is something more than reducing a general appropriation so that the expenses in some or in all departments of the college must be reduced, leaving the proper supervisors to determine how efficiency can be best maintained under new conditions. The Constitution has given to the relator the general supervision of the college and the direction and control of all agricultural college funds. So long as the relator employs them for the purposes intended by the grant, it is beyond the power of the legislature to control the relator's use of the funds received from the Federal government and long ago appropriated to the agricultural college. Undoubtedly the grant of funds was to the State, .and the disposition of them wholly within the power of the State, acting through its legislature, in accordance with the conditions of the trust imposed. *Montana, ex rel. Haire,* v. *Rice,* 204 U. S. 291 (27 Sup. Ct. 281); *Wyoming, ex rel. Wyoming Agricultural College,* v. *Irvine,* 206 U. S. 278 (27 Sup. Ct. 613). See, also, *Massachusetts Agricultural Col-*

*lege* v. *Marden,* 156 Mass. 150 (30 N. E. 555). I am called upon to neither affirm nor deny the proposition that the legislature may now appropriate the Federal fund, in whole or in part, to some other institution, withdrawing it, or some of it, from the agricultural college, so long as it keeps faith with the congress. The legislature has not withdrawn it from the college nor appropriated it, or any part of it, to another institution. It remains an *agricultural college fund,* within the meaning of the Constitution, devoted, under the supervision and direction of the relator, to the college and to the purposes expressed in the grant, in State legislation, and, finally, in the Constitution of the State. It is required to be "annually applied to the specific objects of the original gift, grant or appropriation." Necessarily it must be so applied, under existing conditions, by the constitutional supervisors of the fund, and of the college, and not by the legislature. It follows that the legislature exceeded its powers in attempting to deprive the relator of its constitutional control of agricultural college funds derived from the Federal government. The constitutional powers of the State board of agriculture with respect to the college and its funds are the same as those of the board of regents of the university with respect to the university and its funds, and authority for the conclusion stated may be found in *Sterling* v. *Regents of the University,* 110 Mich. 369 (68 N. W. 253, 34 L. R. A. 150) ; *Board of Regents* v. *Auditor General,* 167 Mich. 444 (132 N. W. 1037), as well as in *Bauer* v. *State Board of Agriculture,* 164 Mich. 415 (129 N. W. 713).

I assume that the legislature, in amending the original bill by adding section 1 (*a*) thereto, acted in good faith and with the highest motives. I am obliged to find that in doing so constitutional powers were exceeded. I am obliged to find, further, that the legislative intent was to deprive the college of all funds,

however derived, upon the contingency expressed in the act. This being so, the question is whether it can be said that the act would have passed without the condition.

In deciding this question, we are not concerned with, do not inquire into, and cannot know the purpose and intent of legislators. We must look at the law itself and judicially ascertain the intent of the legislature.

"If a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other. But if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail unless sufficient remains to effect the object without the aid of the invalid portion. And if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect the legislature would not pass the residue independently, then if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them." Cooley's Constitutional Limitations (6th Ed.), p. 211.

There are some facts which we may and do know which aid us in this inquiry. We know that in the year 1901, and until the year 1913, the State appropriation for the agricultural college was one-tenth of a mill. In 1913, by the act in question here, this appropriation was increased, upon condition, to one-sixth of a mill. The appropriation made in 1901 does not fail if the act of 1913 is held invalid. The college will still receive the proceeds of a tax of one-tenth of a mill upon the taxable property of the State, and it appears that upon this basis something remains in the treasury. It is contended that the decision of this court in *Moreland* v. *Millen,* 126 Mich. 381 (85 N. W. 882), supports the ruling that the act may stand, notwithstanding the invalid condition, and that

to hold otherwise is to overrule the decision in that case. I have read the opinions delivered in that case with care and with no disinclination to sustain the relator in this controversy. The cases seem to me to be wholly unlike. For the purposes of the decision in that case, it was assumed in the majority opinion that the legislature, in the act there in question, sought to improve the method of administering public works in the city of Detroit. The act made radical changes in the existing law. It provided finally that a superintendent of public works should be appointed, for a designated, but short, period of time, by the governor of the State, and thereafter by the mayor of the city. It was held that the legislature exceeded its powers in providing for the provisional appointment, but that the whole law was not thereby made invalid. It was held further that, an office having been created by the act, the mayor might proceed at once to fill it by appointment. In that case the invalid portion of the act provided for a mere detail; in this case it is the condition upon which an increased appropriation is made. It is as though the legislature, in 1913, had for that year, and each succeeding year, provided a fund for the college, and for a further sum to be given it upon condition.

The whole act must fail, and, this being so, the respondent should be advised (it is unlikely that a writ will be necessary) that the act of 1913 is void; that the act of 1901 is in force; that the fund derived from the Federal government and a fund equal to the one created by that act are within the control of the relator.

MCALVAY, C. J., and BROOKE, KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred.