(No. 7094.  July 7, 1943.)

LEONA DREPS, Respondent, v. BOARD OF REGENTS
OF THE UNIVERSITY OF IDAHO, a corporation, Ap-
pellant.

[139 Pac. (2d) 467.]

Elam & Burke for appellant.

Elder & Elder for respondent.

AILSHIE, J.—This appeal involves the powers and duties of the "Regents of the University of Idaho."

November 1, 1940, respondent was appointed by the board, then consisting of A. L. Swim, Mrs. A. A. Steel, W. C. Geddes, W. F. McNaughton, and J. H. Andersen, as nurse in the university infirmary, at the agreed salary of $90 per month, per year of ten months. By resolution entered April 26, 1941, respondent was reappointed by the board at the same salary for another year. At the time of her reappointment, the board was composed of the same personnel as above named with the exception that J. F. Jenny was serving instead of W. C. Geddes, whose term had expired. Respondent is a niece of the wife of Regent Jenny. Sometime after respondent's reappointment, the board declined to pay her salary, on the grounds that her employment was in violation of the Nepotism Act, sec. 57-701, I.C.A. This action was instituted against the Board of Regents, to recover the salary earned by respondent under her appointment.

This appeal involves two questions: (a) Does the Nepotism Act apply to the Board of Regents of the University of Idaho? And (b) If it was intended to so apply, did the legislature have the power to make it applicable to the Board of Regents of the University of Idaho?

If the legislature had no power to extend the Nepotism Act to the Board of Regents, then of course it will be unnecessary to further consider the matter as to whether the legislature so intended by the passage of this act. In order to determine the power of the legislature to apply the Nepotism Act (sec. 57-701, supra) to the Board of Regents, it becomes necessary to consider the manner of creation of the Board of Regents and the powers, authority, and privileges conferred upon the board as the governing body of the University of Idaho.

The University of Idaho was established by act of the

territorial legislature approved January 30, 1889, which act, for convenience, is set out in full in the footnote hereto.[1]

[1] 15th Territorial Sess. Laws (1889), p. 21.

"Section 1. There is hereby established in this Territory, at the Town of Moscow, in the County of Latah, an institution of learning, by the name and style of 'The University of Idaho.'

"Sec. 2. The government of the University shall vest in a Board of Regents, to consist of nine members, chosen from the Territory at large, which Board the Governor shall nominate, and by and with the advice and consent of the Legislative Council appoint. The term of office of the said Regents shall be two years from the first Monday in February in the year in which appointed.

"Sec. 3. The Board of Regents and their successors in office, shall constitute a body corporate, by the name of 'The Regents of the University of Idaho,' and shall possess all the powers necessary or convenient to accomplish the objects and perform the duties prescribed by law, and shall have the custody of the books, records, buildings and other property of said University. The Board shall elect a President, Secretary and Treasurer, who shall perform such duties as shall be prescribed by the by-laws of the Board. The Secretary shall keep a faithful record of all the transactions of the Board and of the Executive Committee thereof. The Treasurer shall perform all the duties of such office, subject to such regulations as the Board may adopt, and for the faithful discharge of all his duties shall execute a bond in such sum as the Board may direct.

"Sec. 4. The time of the election of the President, Secretary and Treasurer of said Board, and the duration of their respective terms of office and the times for holding the regular annual meeting and such other meetings as may be required, and the manner of notifying the same, shall be determined by the by-laws of the Board. A majority of the Board shall constitute a quorum from time to time.

"Sec. 5. The Board of Regents shall enact laws for the government of the University in all its branches, elect a President and the requisite number of professors, instructors, officers and employees, and fix the salaries and the term of office of each, and determine the moral and educational qualifications of applicants for admission to the various courses of instruction; but no instruction either sectarian in religion or partisan in politics shall ever be allowed in any department of the University, and no sectarian or partisan test shall ever be allowed or exercised in the appointment of Regents or in the election of professors, teachers or other officers of the University, or in the admission of students thereto, or for any purpose whatever. The Boards of Regents shall have power to remove the President or any

.It will be seen from an examination of the act, that the territorial legislature created and established a state educational institution and located it at Moscow in Latah County,

professor, instructor or officer of the University, when in their judgment, the interests of the University require it. The Board may prescribe rules and regulations for the management of the libraries, cabinet, museum, laboratories and all other property of the University and of its several departments, and for the care and preservation thereof, with penalties and forfeitures, by way of damages for their violation, which may be sued for and collected in the name of the Board before any Court having jurisdiction of such action.

"Sec. 6. The Board of Regents are authorized to expend such portion of the income of the University fund hereinafter created, as they may deem expedient for the erection of suitable buildings and the purchase of apparatus, a library, cabinets and additions thereto.

"Sec. 7. At the close of each fiscal year, the Regents, through their President, shall make a report in detail to the Governor, exhibiting the progress, conditions and wants of the University, the course of study, the number of professors and students, the amount of receipts and disbursements, together with the nature, costs and results of all important investigations and experiments, and such other information as they may deem important.

"Sec. 8. The President of the University shall be President of the faculty or of the several faculties as they may be hereafter established and the executive head of the instructional force in all its departments; as such, he shall have authority, subject to the Board of Regents, to give general direction to the instruction and scientific investigation of the University, and so long as the interests of the institution require it he shall be charged with the duties of one of the professorships. The immediate government of the University shall be intrusted to the Faculty, but the Regent shall have the power to regulate the course of instruction, and prescribe the books or works to be used in the several courses, and also to confer such degrees and grant such diplomas as are usual in Universities, or as they shall deem appropriate, and to confer upon the Faculty by by-laws, the power to suspend or expel students for misconduct or other cause prescribed by such by-laws.

"Sec. 9. The object of the University of Idaho, shall be to provide the means of acquiring a thorough knowledge of the various branches of learning connected with scientific, industrial and professional pursuits, and to this end it shall consist of the following colleges or departments, to-wit:

"First—The College or Department of Arts.

"Second—The College or Department of Letters.

Idaho, and declared that it should be named and styled "The University of Idaho" (sec. 1.). It further provided: "The government of the University shall vest in a Board

"Third—The professional or other colleges or departments as may from time to time be added thereto or connected therewith.

"Sec. 10. The College or Department of Arts shall embrace courses of instruction in mathematical, physical and natural sciences with their application to the industrial arts, such as agriculture, mechanics, engineering, mining and metallurgy, manufactures, architecture and commerce in such branches included in the College of Letters, as shall be necessary to a proper fitness of the pupils in the scientific and practical courses for their chosen pursuits, and as soon as the income of the University will allow, in such order as the wants of the public shall seem to require, the said courses in the sciences and their application to the practical arts shall be expanded into distinct colleges of the University, each with its own Faculty and appropriate title. The College of Letters shall be co-existent with the College of Arts, and shall embrace a liberal course of instruction in language, literature and philosophy, together with such courses or parts of courses in the College of Arts as the Regents of the University shall prescribe.

"Sec. 11. The University shall be open to female as well as male students, under such regulations and restrictions as the Board of Regents may deem proper.

"Sec. 12. No student who shall have been a resident of the Territory for one year, next preceding his admission shall be required to pay any fees for tuition in the University, excepting in a professional department and for extra studies. The Regents may prescribe rates of tuition for any pupil in a professional department, or who shall not have been a resident as aforesaid, and for teaching extra studies.

"Sec. 13. The Board of Regents herein provided for, shall be appointed immediately after this act becomes a law; and within ninety days after the appointment of said Regents, the Board shall meet at Boise City, and elect a President, Secretary and Treasurer thereof, and shall at said meeting adopt by-laws for the government of said Board and the officers chosen by virtue of this act.

"Sec. 14. The sum of fifteen thousand dollars is hereby appropriated out of any money in the Territorial Treasury of Idaho, not otherwise appropriated, and the Territorial Comptroller is hereby authorized to draw his warrant on the Territorial Treasurer for said amount, and the Territorial Treasurer is hereby directed and com-

of Regents" (sec. 2). It further provided that, "The Board of Regents and their successors in office, shall constitute a *body corporate,* by the name of 'The Regents of the Univer-

manded to pay the same, as hereinafter provided, which money shall be expended for the following purposes, to-wit:

"First—The purchase of a site or grounds for said University, said location to consist of not less than ten nor more than twenty acres of ground, and for the improvement of the same, and for keeping the same in repair.

"Second—To advertise for and obtain plans and specifications for a University building under such rules and regulations as the Board may impose.

"Third—For the payment of the necessary expenses of said Board, as hereinafter provided.

"Sec. 15. The President and Secretary ex-officio, and one member of the Board to be appointed by the President thereof, shall constitute an Executive Committee of said Board, whose duties shall be prescribed by the by-laws of the Board.

"Sec. 16. Upon executing and filing with the Territorial Treasurer a good and sufficient bond, in whatever sum the Board of Regents shall direct, provided said bond shall have been first approved by the Territorial Attorney-General, the Territorial Treasurer shall pay over to the Treasurer of said Board the sum of fifteen thousand dollars, or so much thereof as may be available; and in the event said sum is not paid in full upon the execution and delivery of said bond as aforesaid, then the remainder of said sum shall be transferred to the Treasurer of said Board as speedily as the fund shall accumulate therefor.

"Sec. 17. The Treasurer of said Board shall, out of any moneys in his hands belonging to said Board, pay all orders drawn upon him by the President and Secretary thereof, when accompanied by vouchers fully explaining the character of the expenditure, and the books and accounts of the Treasurer shall at all times be opened to the inspection of the Board. The Treasurer shall make an annual report to the President of the Board of all transactions connected with the duties of his office.

"Sec. 18. There shall be levied and collected annually, a Territorial tax of one-half mill for each dollar of the assessed valuation of the taxable property of the Territory, which amount, when so levied and collected, shall be appropriated to a University Building Fund, to remain in the Treasury subject to the order of the Board of Regents; but in no event shall said Board appropriate the funds thus collected,

s:ty of Idaho' ". It will be further noted (sec. 3) that the board and their successors in office "constitute a body corporate"; and that they are given "the custody of the books, records, buildings and other property" of the university and power to employ (sec. 5) "a president and the requisite number of professors, instructors, officers and employees (*Hyslop v. Board of Regents*, 23 Ida. 341, 129 P. 1073) and fix the salaries and the term of office of each." They are further authorized to "enact laws for the government of the university in all its branches"; it also provides for the creation of "colleges or departments" (sec. 9) in the different branches of knowledge and learning.

Following the creation and organization of the university, the constitutional convention met in August, 1889, drafted and submitted to the people a constitution which was ratified and approved November 5, 1889, in and by the terms of which the "University of Idaho" was recognized as a separate and independent educational institution of the new state to be. Article 9 of the constitution was devoted to the subject of "Education and School Lands." Sec. 10 of that article provides:

"The location of the University of Idaho, as established by existing laws, is hereby confirmed. All the rights, immunities, franchises, and endowments, heretofore granted thereto by the territory of Idaho are hereby perpetuated unto the said university. The regents shall have the general supervision of the university, and the control and direction of all the funds of, and appropriations to, the university, under

---

or any portion thereof, to any purpose other than that for which said fund was provided; *and provided further,* that said tax shall not be levied and collected for a longer period than four years.

"Sec. 19. The Regents shall receive the actual amount of their expenses in traveling to and from and in attendance upon all meetings of the Board or incurred in the performance of any duty in pursuance of any direction of the Board; accounts of such expenses shall be duly authenticated and audited by the Board, and be paid on their order by the Treasurer out of any fund belonging to the University not otherwise appropriated; no Regent shall receive any pay, mileage or *per diem*, except as above prescribed.

"Sec. 20. This act shall take effect and be in force from and after its passage.

"Approved January 30, 1889."

such regulations as may be prescribed by law. No university lands shall be sold for less than ten dollars per acre, and in subdivisions not to exceed one hundred and sixty acres, to any one person, company or corporation."

The foregoing provision of the constitution, ratified and approved by the people of the state, definitely fixed the location of the University of Idaho as established by existing laws and then provided:

*"All the rights, immunities,. franchises, and endowments heretofore granted thereto by the territory of Idaho are hereby perpetuated unto the said university."*

By this provision, the territorial act, creating the university and prescribing the powers, duties and authority of the Board of Regents, was written into the constitutional corporate charter of the university as fully as if it had been set out at length in the constitution. (*Wright v. Callahan*, 61 Ida. 167, 99 P. (2d) 961.) Its rights, immunities, franchises and endowments were placed definitely and permanently beyond the power of the legislature to disturb, limit or interfere with them.

It is contended, however, that the following sentence confers certain law-making power on the legislature: "The regents shall have the general supervision of the university, and the control and direction of all the funds of, and appropriations to, the university, *under such regulations as may be prescribed by law.*" (Italics supplied.) It is not believed that the framers of the constitution meant any such thing by using the words, "under such regulations as may be prescribed by law," for the reason that to give this clause such a construction would contradict and repudiate the terms of the preceding sentence and likewise impair the authority conferred by the territorial act, which was made a part of the constitutional charter and declared "hereby perpetuated."

It seems reasonable and consonant with the other portions of the section (10), to believe that "such regulations as may be prescribed by law" were intended to refer *only* to *appropriations the legislature might make* to the university from time to time. This thought finds support in the answer of Mr. Sweet to an inquiry made by the president (Mr. Clagget) of the convention (vol. I, Debates, Const. Conv., pp. 766-767), to the effect that the clause "directs that all appropriations and moneys appropriated to the university shall be

handled by the regents as prescribed by law." (See also vol. II, Debates, p. 1291.)

"Regulate" does not mean to *prohibit, or destroy* or *change,* but rather signifies "to adjust by rule, method or established mode; to direct by rule or restriction;" (Black, Law Dic.) "to reduce to order, method or uniformity." (Webster, Internatl. Dic.; *Warren v. Indiana Tel Co.,* 26 N.E. (2d) 399, 217 Ind. 93; *N. J. Good Humor v. Board of Commrs.,* 124 N.J.L. 162, 11 A. (2d) 113, 118, *State v. Leonard,* 164 Or. 579, 102 P. (2d) 197; 129 A.L.R. 1125.) It is the antonym of "disorder, upset, disarrange."

The foregoing definitions all carry the implication that the word "regulations" used in this section of the constitution refers more to the manner, method, procedural and orderly conduct of business than to mandatory or prohibitive legislation. This view of that provision was evidently entertained and recognized by the court in *State v. Board of Education,* 33 Ida. 415, 196 P. 201, wherein the same section was under review and it was said:

"3. Const., art. 9, sec. 10, vests in the board of regents of the University of Idaho, 'the general supervision of the university, and the control and direction of all the funds of, and appropriations to, the university, under such regulations as may be prescribed by law.' The regulations which may be prescribed by law and which must be observed by the regents in their supervision of the university, and the control and direction of its funds, refer to methods and rules for the conduct of its business and accounting to authorized officers. Such regulations must not be of a character to interfere essentially with the constitutional discretion of the board, under the authority granted by the constitution."

It is true the university is "under the exclusive control of the state" but that does not make it a department of *state government* or subordinate to the legislature. (See *People v. Barrett,* 382 Ill. 321, 46 N.E. (2d) 951.) It is also true that the university is a "state agency", in the sense that it has been created by the state and exists as a public corporation for educational purposes; but the legislature has no power to impair, dissolve or destroy it. It received its charter and authority from the people at the same time and in the same manner the legislature was created, each independent and exclusive of the other in the sphere of its own purpose and objects.

In *State v. State Board of Education*, 56 Ida. 210, 214, 52 P. (2d) 141, we had under consideration the powers and authority of the State Board of Education and State Board of Regents of the University of Idaho, under the provisions of sec. 10, art. 9, and said:

"At the same time and by the same organic charter that adopted sec. 3, art. 8 of the constitution, the independent, separate, corporate existence of the Territorial Board of Regents was recognized, approved and confirmed."

In considering the powers and authority of the legislature in this respect, as compared with the power and authority of the Board of Regents, we must bear in mind that each gets its authority direct from the people and each is created by the constitution itself, so that the one has no authority over the other, unless it is specifically so granted by the constitution under which each was created. The legislature is the constitutional law-making body established by the people and composed of many individuals but acting as a whole as the law-making branch of the government. While, on the other hand, the University of Idaho is a constitutional corporate body created by the same instrumentality and approved by the same electorate endowed with specified powers. (*Moscow Hdwe. Co., Ltd., v. Regents of U. of I.*, 19 Ida. 420, 421, 113 P. 731.)

Other courts have been called upon to consider kindred questions in relation to the powers of regents of state universities. The University of Michigan was chartered by the constitution in many respects in the same manner as was done in Idaho. In *Sterling v. Regents of the University of Michigan*, 110 Mich. 369, 68 N.W. 253, 34 L.R.A. 150, the question arose as to the power of the legislature to require the regents "to establish a homoeopathic medical college as a branch or department of said university, which shall be located in the city of Detroit," etc. The court held that the legislature had no such power over the regents, saying:

"The board of regents and the legislature derive their power from the same supreme authority, namely the constitution. In so far as the powers of each are defined by that instrument, limitations are imposed, and a direct power conferred upon one necessarily excludes its existence in the other, in the absence of language showing the contrary intent."

Later and in the case of *Board of Regents v. Auditor General*, 167 Mich. 444, 132 N.W. 1037, the question arose

as to the power and authority of the Auditor General to direct or control the expenditure of moneys appropriated for the use and maintenance of the university. The court held that no such power existed and that the Regents of the university had sole and exclusive power and authority over the matter and, among other things, said:

"By the constitution of 1850, and repeated in the new constitution of 1908, the Board of Regent is made the highest form of juristic person known to the law, a constitutional corporation of independent authority, which, within the scope of its functions, is co-ordinate with and equal to that of the legislature. By the old constitution it is given 'direction and control of all expenditures from the university interest fund' (sec. 8, art. 13) ; and by the new constitution 'general supervision of the university, and the direction and control of all expenditures from the university funds.' (Sec. 5, art. 11.) That the Board of Regents has independent control of the affairs of the university by authority of these constitutional provisions is well settled by former decisions of this court. (*People v. Regents,* 4 Mich. 98; *Weinberg v. Regents of the University,* 97 Mich. 254, 56 N.W. 605; *Sterling v. Regents of the University,* 110 Mich. 382, 68 N.W. 253, 34 L.R.A. 150; *Bauer v. State Board of Agriculture,* 164 Mich. 415, 129 N.W. 713.) Strong and unequivocal language is used in these decisions. 'The respondents are constitutional officers to whom was confided by the constitution the general supervision of the University, and the direction and control of all expenditures from the University interest fund. . . . To their judgment and discretion as a body is committed the supervision of the financial and all other interests of an institution, in which all the people of this state have a very great interest.' (*People v. Regents,* supra.) 'But the general supervision of the university is by constitution vested in the regents . . . . So, when the state appropriates money to the university it passes to the regents and becomes the property of the university, to be expended under the exclusive direction of the regents, and passes beyond the control of the state through its legislative department . . . . Under the constitution, the state cannot control the action of the regents . . . . It cannot add to or take away from its property without the consent of the regents. In making appropriations for its support the legislature may attach any conditions it may deem expedient and wise, and the regents cannot receive the appropriation without com-

plying with the conditions. This has been done in several instances."

The University of Minnesota was chartered by the territorial legislature in 1851 and granted powers and authority almost identical with the territorial act which created the University of Idaho. On coming into statehood in 1858, the constitution (art. 8, sec. 4) confirmed the establishment and location of the university as follows:

" 'And said institution is hereby declared to be the "University of the State of Minnesota." All the rights, immunities, franchises and endowments heretofore granted or conferred are hereby *perpetuated* unto the said university; and all lands which may be granted hereafter by congress, or other donations for said university purposes, shall vest in the institution referred to in this section.' " (*State ex rel University of Minnesota v. Chase,* 175 Minn. 259, 220 N.W. 951, 953.)

In commenting on this constitutional provision, the Supreme Court of Minnesota in *State v. Chase,* supra, p. 954, said:

"That a corporation was created by the act of 1851 and 'perpetuated' by the constitution with 'all the rights, immunities, franchises and endowments' which it then possessed is plain. Of that corporation the regents were both the sole members and the governing board. They were the corporation in which were perpetuated the things covered by the constitutional confirmation. The language has a definite legal import; the terms are those of confirmation in perpetuity of a prior grant of corporate rights. So the university, in respect to its corporate status and government, was put beyond the power of the legislature by paramount law, the right to amend or repeal which exists only in the people themselves."

The opinion in that case is very interesting and elucidating, when considering the powers and authority granted to the University of Idaho and its board of regents. (See also, *State Board of Agriculture v. State Administrative Board,* 226 Mich. 417, 197 N.W. 160; *State Board of Agriculture v. Fuller,* 180 Mich. 349, 147 N.W. 529, 532; *Civil Service Comm. of Michigan v. Auditor General,* 302 Mich. 673, 5 N.W. (2d) 536, 541.)

In the recent case of *People v. Barrett,* 382 Ill. 321, 46 N.E. (2d) 951, the issue arose as to whether the attorney general of Illinois had the right or authority to represent

the University of Illinois, "A public corporation" organized under the laws of that state, in litigation or whether the trustees of the corporation had the right to employ their own counsel. The opinion goes into the question at great length and considers the nature of the corporation, its relation to the state, its freedom from and independence of the legislature and, among other things, says:

"In the sense that it is a department or branch of the state government, the University of Illinois is not an agency or instrumentality of the state. It is a separate corporate entity, which functions as a public corporation. It is not the duty of the Attorney General to represent either the corporation or the trustees, by virtue of his office, as chief law officer of state. He has no right to do so. Both the university as a public corporation and its trustees are entitled to select their own legal counsel and advisor and to be represented in all suits brought by or against them by counsel of their own choice."

We conclude that the legislature possesses no power to place any restrictions on the board of regents in the matter of their employment of professors, officers, agents, or employees; nor can they tell the board whom they may and may not appoint. We therefore conclude that it was not the intention of the legislature to extend the Nepotism Act (sec. 57-701, I.C.A.) to the University of Idaho or to the board of regents thereof. (*Grice v. Clearwater Timber Co.,* 20 Ida. 70, 77, 117 P. 112; *Garrett Transfer etc. Co. v. Pfost,* 54 Ida. 576, 590, 33 P. (2d) 743; *Johnson v. Diefendorf,* 56 Ida. 620, 637, 57 P. (2d) 1068; *Robinson v. Enking,* 58 Ida. 24, 27, 69 P. (2d) 603.)

The judgment is affirmed. Costs to respondent.

Holden, C.J., concurs.

GIVENS, J., concurring specially.—I concur that two questions may be involved, as indicated in the majority opinion by Ailshie, J.: "(a) Does the Nepotism Act apply to the Board of Regents of the University of Idaho? And (b) If it was intended to so apply, did the legislature have the power to make it applicable to the Board of Regents of the University of Idaho?"

Likewise, I concur in the second conclusion at the end of the opinion, namely, that "it was not the intention of the legislature to extend the Nepotism Act to the University

of Idaho or the Board of Regents thereof." Such conclusion, it seems to me, is clearly premised on *Barton v. Alexander,* 27 Ida. 286, 148 P. 471, Ann. Cas. 1917D, 729, and *In re Rogers, Randall & Pitzen,* 56 Ida. 521, 57 P. (2d) 342. If the statute was not intended to apply, it seems to me that it is unnecessary to discuss the constitutional interpretation of the statute, and that under repeated holdings of this court we should not do so. (*Jack v. Village of Grangeville,* 9 Ida. 291, at 316, 74 P. 969; *Mills Novelty Co. v. Dunbar,* 11 Ida. 671, at 677, 83 P. 932; *Logan v. Carter,* 49 Ida. 393, at 403, 288 P. 424; *In re Allmon,* 50 Ida. 223, at 226, 294 P. 528; *Garrity v. Board of County Commrs.,* 54 Ida. 342, at 357, 34 P. (2d) 949; *In re Brainard,* 55 Ida. 153, at 157, 39 P. (2d) 769; *United Mercury Mines Co. v. Pfost,* 57 Ida. 293, at 296, 65 P. (2d) 152; *Albrethsen v. State,* 60 Ida. 715, at 718, 96 P. (2d) 437; *McLean v. Hecla Mining Co.,* 62 Ida. 75, at 78, 108 P. (2d) 299; *Peck v. State of Idaho,* 63 Ida. 375, 120 P. (2d) 820, at 823.)

I therefore concur in the result, based upon the second conclusion, but refrain at this time from concurring or dissenting as to the first conclusion, as the same is unnecessary to a proper determination of the case, thus adhering to the above rule reiterated by this court.

DUNLAP, J., concurring specially.—I agree with the conclusions reached by Mr. Justice Givens, in his special concurrence herein.

BUDGE, J., did not sit at the hearing or participate in the foregoing opinion.