Motion to expunge bill of exceptions denied October 24, 1939;
argued February 27; reversed May 14; rehearing
denied June 18, 1940

STATE EX REL. KASER v. LEONARD ET AL.

(94 P. (2d) 1113, 102 P. (2d) 197)

In Banc.

*H. T. Botts*, of Tillamook, for the motion.

*Platt, Henderson, Warner & Cram*, of Portland, and *George P. Winslow*, of Tillamook, opposed.

BAILEY, J. The respondent has filed a motion to expunge from the record in this court the appellants' bill of exceptions, on the ground that the circuit court "was without jurisdiction to settle any bill of exceptions whatever at the time it undertook to do so because the order for extension of time was not made in compliance with the rules of the circuit court applicable to that situation, nor was said order [extending the time in which the bill of exceptions might be tendered] entered within the time prescribed by statute, that is, within sixty days after the entry of the judgment in this cause."

The action was instituted in the circuit court of the state of Oregon for Tillamook county and was tried before the Honorable Joseph H. Page, judge *pro tempore*. Judgment was entered in favor of the plaintiff and against the defendants on February 28, 1939. Notice of appeal was served and filed by the defendants April 25, 1939. On this latter date the trial judge made an order extending the defendants' time to tender and file a bill of exceptions sixty days beyond the time allowed by law. This order was not filed until May 24, 1939.

On July 19, 1939, the judge who heard the case entered an order in which it is recited that one of the attorneys for the defendants "made oral application

to the court in chambers at Portland, Oregon, on the twenty-fifth day of April, 1939, for sixty days' time in addition to that allowed by law, in which to file a bill of exceptions in the within cause''. The order further recites that, ''it appearing . . . proper that such additional time be granted, the court at said time and place granted said application, and announced that such additional time was granted, and as evidence of such allowance on said twenty-fifth day of April, 1939, in chambers at Portland, Oregon, signed an order granting such additional time and delivered such signed order'' to the attorney for the defendants for transmission to the clerk of the circuit court for Tillamook county, for filing and entry; and that such order was forwarded by that attorney to an associate attorney at Tillamook, Oregon, and through inadvertence was not presented to the clerk for filing until May 24, 1939. It is then directed that the order made April 25, 1939, be entered *nunc pro tunc* as of April 25, 1939.

In the certificate to the bill of exceptions the court states that the purported bill of exceptions was served upon the attorney for the plaintiff and presented to the circuit court on June 24, 1939, and that on that date counsel for the plaintiff served and filed objections to the allowance of the bill of exceptions for the reason that the same had not been filed within the time allowed by law. The certificate further recites the making of the order of April 25, 1939, granting to the defendants sixty days' additional time in which to present a bill of exceptions, the handing of such order by the court to the attorney for the defendants for transmission to the clerk of the circuit court for Tillamook county for entry, the failure to have the same filed before May 24, 1939, and the making and entry of the

order of July 19, directing that the order signed April 25, 1939, be entered *nunc pro tunc* as of that date.

Section 2-703, Oregon Code 1935 Supplement, provides in part as follows:

"A proposed bill of exceptions may be tendered by presenting it to the clerk of the court within sixty [60] days after the entry of the judgment or decree, or within such further time as may be granted by order of the court if application is made during the said period of sixty [60] days or within any extension that may be granted."

The law does not, as evidenced by the above quoted excerpt, require that if application for an extension of time be made within sixty days from entry of the judgment, the order granting additional time must be entered within the sixty days.

In *Hart v. State Industrial Accident Commission*, 148 Or. 692, 38 P. (2d) 698, this court, after reviewing its decisions touching upon the matter of time within which a bill of exceptions may be settled and signed by the circuit court under the law as it existed prior to the 1931 amendment (Oregon Laws 1931, chapter 49), which is codified as § 2-703, *supra,* referred to that amendment and the decisions construing it. The court then said:

"Based upon the 1931 amendment and the three cases last above cited, we hold that it is mandatory upon a litigant seeking to have a bill of exceptions settled by the trial judge to tender the same within sixty days after the entry of the judgment or within such further time as may be granted by order of the court upon application for such extension made during the said period of sixty days or within any extension of time that may have been granted."

Immediately preceding the excerpt quoted, with reference to the case of *State v. Terwilliger*, 141 Or. 372, 11 P. (2d) 552, 16 P. (2d) 651, 661, the same opinion states:

"After reviewing the history of these amendments to the statute relating to the tendering of a bill of exceptions, the court allowed the motion to strike the bill of exceptions from the files, for the reason that the 1931 amendment of § 2-703, Oregon Code 1930, required the same to be tendered within sixty days from the date of entry of judgment, or such time as might be specified by order of the court upon application made within the said sixty days."

Counsel for the respondent cites and relies upon *Bird v. Ellingsworth*, 156 Or. 103, 59 P. (2d) 261, 65 P. (2d) 674, to sustain his contention that no extension granted by the court is effective unless the order providing for it is entered within the sixty days allowed by statute for tendering a proposed bill of exceptions. In that instance no motion was filed or application made for an extension of time until more than sixty days after the entry of judgment, and this court held that the motion was not filed within the time limited by § 2-703, Oregon Code 1930, as amended by chapter 49, Oregon Laws 1931. The question of when the order must be entered was not there directly involved.

The statutory provision relating to the granting of an extension of time within which a proposed bill of exceptions may be tendered differs materially in wording from the provision regarding extension of time within which a transcript on appeal may be filed in the supreme court. In the latter case, it is provided by § 7-507, subdivision 2, Oregon Code 1930, that the time in which a transcript must be filed in the supreme court may be extended by order of the court, "but such

order shall be made within the time allowed to file the transcript, and only after three days' notice has been given to the opposing party''.

*Hollywood Orchards Company v. Dennis,* 124 Or. 71, 240 P. 881, 263 P. 66, cited by the respondent as indicating that the order granting an extension of time must be entered before the expiration of the statutory period, had reference to an extension of time for filing a transcript and did not concern an extension of time for presenting a proposed bill of exceptions. Had the legislature intended that an extension of time beyond sixty days, in which to file a bill of exceptions, would be effective only in the event that the order was made before the expiration of that period, it would undoubtedly have used language similar to that found in § 7-507, *supra.* In our opinion, the legislature did not intend that in instances in which application for an extension of time to file a bill of exceptions is made within sixty days after entry of the judgment the order granting such extension must be made and entered before the expiration of that sixty-day period. In other words, the order can be made and entered after the sixty days, provided application for an extension of time has been made prior to the expiration of sixty days following entry of judgment.

Section 2-703, *supra,* does not provide that an application for extension of time within which to file a bill of exceptions must be made in writing, and our attention has not been directed to any other statute or any rule of the circuit court for Tillamook county requiring such an application to be in writing. Rule 5 of that court, which provides that ''copies of all papers filed in a cause must be served on the attorney of the adverse party whenever such party has appeared by

attorney", has no bearing upon orders entered pursuant to oral motions or oral applications.

In view of the conclusion that we have reached herein, it is not necessary to express an opinion in regard to other questions raised by both the respondent and the appellants.

The motion to expunge the bill of exceptions is denied.

---

Argued February 27; reversed May 14; rehearing denied
June 18, 1940

ON THE MERITS

(102 P. (2d) 197)

In Banc.

Appeal from Circuit Court, Tillamook County.

JOSEPH H. PAGE, Judge pro tempore.

Proceeding by the State of Oregon, on the relation and for the use of John Kaser, against Charles H. Leonard and the Great American Indemnity Company, to recover wage claims. From an adverse judgment, the defendants appeal.

REVERSED. REHEARING DENIED.

*Wilber Henderson,* of Portland (George P. Winslow, of Tillamook, and Platt, Henderson, Warner & Cram, of Portland, on the brief), for appellants.

*H. T. Botts,* of Tillamook (L. V. Lundburg, of Portland, on the brief), for respondent.

ROSSMAN, J. This is an appeal by the two defendants from a judgment of the circuit court entered against them in favor of the State of Oregon to the relation and use of John Kaser. The latter and his seven assignors, whose wage claims are allowed in part

in the judgment attacked by this appeal, were employees of the defendant Charles H. Leonard in the construction of a state highway roadbed. The other defendant, as surety, had signed the undertaking exacted by § 67-1101, Oregon Code 1930, of those who contract with state and municipal corporations for the construction of public improvements. It is conceded that the eight wage claimants were Leonard's employees. The defendants claim, among other matters, that the eight were paid in full. The eight claim that each week during their employment they were paid only a part of their wages.

The answer, besides denying some of the averments of the complaint, submits several affirmative defenses. However, we shall concern ourselves with only one of them—the one which alleges that at the end of each week while the claimants were in Leonard's employ the account between him and each of them for the preceding week's wages was stated, and that he then paid each in full the amount of the stated account. We believe that this case can be determined by ascertaining whether the circumstances attendant upon the weekly payment of wages and the employee's written acknowledgment of payment in full were such that they constituted an account stated and payment of the account. The findings of fact state: "Defendants' defense of account stated as to each of the claimants has not been sustained because in each instance and as to each of said claimants said claimants had no knowledge of the fact that defendant Leonard was required to classify and pay any laborer according to the classification set forth in his contract for the construction of the highway. * * *" The contract stated: "This is a Works Program Highway Project" and imposed upon

Leonard the duty to pay his help the wages exacted by the wage schedules of the United States Bureau of Public Roads and to abide by the classifications set forth in that bureau's rules. If those rules possessed the status of laws, and if the claimants were therefore charged with notice of them, then the premise for the finding just quoted is absent.

The State and Leonard signed the contract which underlies this action September 5, 1935. It bound Leonard to construct 4.17 miles of highway roadbed. He completed his undertaking and was paid in full. The State Highway Commission, which signed the contract on behalf of the State, and which supervised Leonard's performance of it, has submitted as *amicus curiae* an extensive brief urging that this action be dismissed. It reviews the evidence showing that the commission's engineers saw to it that the classifications promulgated by the Federal Bureau of Public Roads were properly observed, that the proper wages were fully paid, and that all other requirements imposed upon Works Program Highway Projects were obeyed.

The money with which the State paid Leonard was received in its entirety from the federal government. The funds were rendered available by the Federal Emergency Relief Appropriation Act of 1935. See 49 Stat. L., ch. 48, p. 115. One of the provisions of the contract bound Leonard to provide "a total of not less than 29,000 man-hours of employment to persons directly employed on the contract in administrative, executive and supervisory positions and for skilled labor, intermediate grade labor and unskilled labor." Another provision required him to hire at least 90 per cent of his employees through the Oregon State Employment Service at Tillamook. That provision of the contract

continued: "Preference in the employment of labor shall be given (except in executive, administrative, supervisory, and highly skilled positions) to persons from the public relief rolls and not less than 90 per cent of all persons working on the contract shall have been taken from the public relief rolls."

The congressional enactment above mentioned states:

"In order to provide relief, work relief and to increase employment by providing for useful projects, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, to be used in the discretion and under the direction of the President, to be immediately available and to remain available until June 30, 1937, the sum of $4,000,000,000. * * * this appropriation shall be available for the following classes of projects, and the amounts to be used for each class shall not, except as hereinafter provided, exceed the respective amounts stated, namely: (a) Highways, roads, streets and grade-crossing elimination, $800,-000,000 * * *. Except as hereinafter provided, all sums allocated from the appropriation made herein for the construction of public highways and other related projects * * * shall be apportioned by the Secretary of Agriculture in the manner provided by * * *. Provided, however, That the expenditure of funds from the appropriation made herein for the construction of public highways and other related projects shall be subject to such rules and regulations as the President may prescribe for carrying out this paragraph and preference in the employment of labor shall be given (except in executive, administrative, supervisory and highly skilled positions) to persons receiving relief, where they are qualified, and the President is hereby authorized to predetermine for each State the hours of work and the rates of wages to be paid to skilled, intermediate, and unskilled labor engaged in such construction therein: * * *.

"Sec. 6. The President is authorized to prescribe such rules and regulations as may be necessary to carry out this joint resolution, and any willful violation of any such rule or regulation shall be punishable by a fine of not to exceed $1,000. * * * The President may fix different rates of wages for various types of work on any project, which rates need not be uniform throughout the United States. * * *

"Sec. 12. The Federal Emergency Administration of Public Works established under title II of the National Industrial Recovery Act is hereby continued until June 30, 1937, and is authorized to perform such of its functions under said Act and such functions under this joint resolution as may be authorized by the President."

Exercising the authority granted to him by the act just mentioned, the President, on May 20, 1935, in a public document entitled "Executive Order" and headed "Prescribing Rules and Regulations Relating to Wages, Hours of Work, and Conditions of Employment under the Emergency Relief Appropriation Act of 1935," announced rules governing in part the expenditure of the appropriation. These rules state:

"* * * The monthly earnings basis referred to heretofore and shown in the foregoing schedule shall be applicable to workers on all projects financed in whole or in part from the Emergency Relief Appropriation Act of 1935, except: * * * (c) highway and grade-crossing elimination work under the supervision of the Bureau of Public Roads and the State highway departments, for which minimum wage rates shall be determined by the State highway departments in accordance with local wage conditions, subject to the approval of and in conformity with standards fixed by the Bureau of Public Roads. * * *"

July 12, 1935, the President signed a document entitled: "Rules and regulations for carrying out the provisions of the Emergency Relief Appropriation Act of 1935 (Public resolution No. 11, 74th Congress) which relate to the construction of public highways and other related projects (except within or adjacent to national forests, national parks, national parkways or other federal reservations) in accordance with the provisions of the Federal Highway Act."

The President's signature was accompanied by those of Henry A. Wallace, Secretary of Agriculture, and Harry L. Hopkins, Works Progress Administrator. Those rules are extensive. Skipping those of no concern to the controversy before us, we observe that Section 11 says:

"All contracts for the construction of highways under this Act shall prescribe the minimum rates of wages as predetermined by the State Highway Department, subject to the approval and in conformity with standards fixed by the Bureau of Public Roads, which contractors shall pay to the different classes of labor, and such minimum rates shall be stated also in the advertisement for bids and in proposals or bids which may be submitted. The wage rates so determined shall be a minimum rate for unskilled labor, a minimum rate for labor intermediate grade, and a minimum rate for skilled labor. The classification of labor employed on highway work into the three classes mentioned shall be in accordance with instructions issued by the Bureau of Public Roads."

Section 12 of the rules provides that contracts for projects under the act shall give preference in the employment of labor, except in executive, administrative and supervisory positions, to persons on the public relief rolls to the extent of at least 90 per cent of those working on the project. Section 14 of the rules demands that the contract contain a provision requiring the con-

tractor to furnish to the State Highway Department on approved forms a copy of his weekly payroll accompanied with an affidavit as to the truthfulness of the entries. Other parts of these rules and regulations require the highway department in any state which has submitted a project for approval to forward data showing, among other items, the ''estimated man-hours of employment'' which it is anticipated the prosecution of the project to completion will involve. Another provision requires state highway departments to confer with the state relief administrator and the state administrator of the Works Progress Administration ''in an endeavor to select projects for which sufficient labor is available locally from relief rolls.'' Another is: ''On all work undertaken on a contract or force account basis the specifications shall stipulate the minimum man-hours of employment established for the project, and no contract shall be awarded or force account work approved on a basis which will provide less than the required man-hours of employment.''

In order to make the situation more readily understandable, we give the following summary: (1) The 1935 Emergency Relief Appropriation Act rendered available $4,000,000,000 to provide relief and work relief and, among other things, said: ''The President is hereby authorized to predetermine for each State the hours of work and the rates of wages to be paid to skilled, intermediate and unskilled labor engaged'' in the prosecution of the work relief projects. (2) May 20, 1935, the President, in an order, announced the wages and hours of work applicable to a variety of relief projects, but excepted highway and grade-crossing elimination projects. His order stated that the minimum wages to be paid to those employed in the

two classifications just mentioned should be determined by state highway departments, subject, however, to the approval of the Bureau of Public Roads. And (3) July 12, 1935, the President, in another executive order, announced the rules and regulations applicable to those engaged, whether as contractors or workers, in highway and grade-crossing elimination projects. These rules and regulations required that upon all such work wages predetermined by the state highway department for skilled, intermediate and unskilled labor, but subject to the approval of and in conformity with the standards of the Bureau of Public Roads, must be paid. We come now to the Federal Bureau of Public Roads.

It will be recalled that the minimum rates of wages were entrusted to the determination of state highway departments "subject to the approval of and in conformity with standards fixed by the Bureau of Public Roads." The Bureau of Public Roads is a division of the Department of Agriculture and administers federal aid funds and emergency appropriations for road construction. See Graske, Federal Reference Manual, p. 139.

The Bureau of Public Roads, in an extensive set of rules and regulations issued July 12, 1935, set forth the standards applicable to workers on public roads and their wages. From these rules we quote the following:

"Wages Hours of Employment, and Conditions of Employment.

Executive or administrative employes shall include * * *.

Supervisory employes shall include foremen * * *.

The following definitions shall govern with respect to the different classes of labor:

## Skilled Labor

Skilled labor shall include the operators of complex heavy power equipment and skilled craftsmen of the journeyman grade whenever and wherever the nature of the work or labor agreements prevailing in the locality of the work require the use of craftsmen of this grade.

## Labor (Intermediate Grade)

(a) The operators of all power equipment other than complex heavy power equipment, except passenger cars, trucks of 1½-ton or less manufacturer's rated capacity, and tractors of less than 20 horsepower manufacturer's rated capacity.

(b) Assistants to skilled craftsmen of the journeyman grade and men doing the work of craftsmen without the full skill, or which does not require the full skill, the term journeyman implies.

(c) Men performing any other labor which requires considerable training and experience.

## Unskilled Labor

Unskilled labor shall include helpers to journeymen and to assistant craftsmen and all other labor which requires no special skill or experience.

The classification of the important labor positions is as follows: Positions not listed will be allocated in accordance with the definitions which appear above, as interpreted in the light of this classification.

## Skilled Labor

\* \* \*

Carpenter, journeyman

\* \* \*

Powder man (heavy rock)

\* \* \*

## Intermediate Grade Labor

\* \* \*

Blacksmith, rough

Blacksmith's assistant

\* \* \*

Carpenter, rough (saw and hammer man)
Carpenter's assistant
Churn drill operator

\* \* \*

Powder man (miscellaneous work, including light solid rock)

\* \* \*

Truck driver (over 1½-ton manufacturer's rated capacity)

*Unskilled Labor*

\* \* \*

Blacksmith's helper

\* \* \*

Carpenter's helper

\* \* \*

Driver, truck (1½-ton manufacturer's rated capacity or less)

\* \* \*

Labor, miscellaneous, unskilled

\* \* \*

Powder monkey (helper)

\* \* \*

Subgrade laborer (hand tools)

\* \* \*

Truck driver (1½-ton manufacturer's rated capacity or less)

\* \* \*

The minimum wage paid to all skilled labor employed on this contract shall be:

One dollar and twenty cents ($1.20) per hour.

The minimum wage paid to all intermediate labor employed on this contract shall be:

Seventy-five cents ($0.75) per hour.

The minimum wage paid to all unskilled labor employed on this contract shall be:

Fifty cents ($0.50) per hour.

\* \* \*,,"

██ Let us now determine whether the executive order which the President signed July 12, 1935, and the rules promulgated by the Bureau of Public Roads on the same day have the effect of laws. The Federal Register Act (49 Stat. L. 500) was not approved until July 26, 1935, and therefore has no application to this case. It will be remembered that the Emergency Relief Appropriation Act of 1935 expressly conferred upon the President extensive authority to prescribe whatever rules and regulations were necessary to carry into effect the purpose which prompted Congress to make the appropriation. Quoting only a few of the sentences in the act which confer such authority upon the President, we have:

"\* \* \* the expenditure of funds from the appropriation made herein for the construction of public highways and other related projects shall be subject to such rules and regulations as the President may prescribe for carrying out this paragraph \* \* \* the President is hereby authorized to predetermine for each State the hours of work and the rates of wages to be paid to skilled, intermediate, and unskilled labor engaged in such construction \* \* \*. In carrying out the provisions of this joint resolution the President is authorized to establish and prescribe the duties and functions of necessary agencies within the Government \* \* \*. The President shall require to be paid such rates of pay for all persons engaged upon any project financed in whole or in part, through loans or otherwise, by funds appropriated by this joint resolution, as will in the discretion of the President accomplish the purposes of this joint resolution, and not affect

adversely or otherwise tend to decrease the going rates of wages paid for work of a similar nature. The President may fix different rates of wages for various types of work on any project, which rates need not be uniform throughout the United States &ast; &ast; &ast;. The authority of the President under the provisions of the Act entitled 'An Act for the relief of unemployment through the performance of useful public work, and for other purposes' approved March 31, 1933, as amended, is hereby continued &ast; &ast; &ast;."

Hence, when that act was passed Congress intended that the executive department of the government should fill in the details.

From 65 C. J., United States, § 33, at page 1272, we quote:

"The 'regulations of an executive department' are the general rules relating to the subject on which a department acts, made by the head of the department under some act of Congress conferring power to make such regulations and thereby give to them the force of the law. By statute, the head of each department is authorized to prescribe regulations not inconsistent with law for the government of his department &ast; &ast; &ast;. Such regulations need not be in any set form, or in writing, and they have the force of law. &ast; &ast; &ast;"

*United States v. Grimaud*, 220 U. S. 506, 55 L. Ed. 563, 31 S. Ct. 480, submitted to the court the question of whether or not rules promulgated by the Secretary of Agriculture have the effect of laws. One of the rules provided: "All persons must secure permits before grazing any stock in a forest reservation." The defendant, who had been indicted for a violation of that rule, demurred to the indictment, claiming that the rule lacked the effect of a law. The demurrer was sustained. In reversing that order, and in sustaining the validity of the rule, the Federal Supreme Court said:

"From the beginning of the Government various acts have been passed conferring upon executive officers power to make rules and regulations—not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress or measured by the injury done. * * *

"It is true that there is no act of Congress which, in express terms, declares that it shall be unlawful to graze sheep on a forest reserve. But the statutes, from which we have quoted, declare, that the privilege of using reserves for 'all proper and lawful purposes' is subject to the proviso that the person so using them shall comply 'with the rules and regulations covering such forest reservation.' The same act makes it an offense to violate those regulations, that is, to use them otherwise than in accordance with the rules established by the Secretary. * * *

"If, after the passage of the act and the promulgation of the rule, the defendants drove and grazed their sheep upon the reserve, in violation of the regulations, they were thereby making an unlawful use of the Government's property. In doing so they thereby make themselves liable to the penalty imposed by Congress.

"It was argued that, even if the Secretary could establish regulations under which a permit was required, there was nothing in the act to indicate that Congress had intended or authorized him to charge for the privilege of grazing sheep on the reserve. These fees were fixed to prevent excessive grazing and thereby protect the young growth, and native grasses, from destruction, and to make a slight income with which to meet the expenses of management. * * *

"The indictment charges, and the demurrer admits that Rule 45 was promulgated for the purpose of regulating the occupancy and use of the public forest reservation and preserving the forest. The Secretary did not exercise the legislative power of declaring the penalty or fixing the punishment for grazing sheep without a permit, but the punishment is imposed by the act itself. The offense is not against the Secretary, but, as the indictment properly concludes, 'contrary to the laws of the United States and the peace and dignity thereof.' The demurrers should have been overruled. * * *"

In *United States v. Birdsall*, 233 U. S. 223, 58 L. Ed. 930, 34 S. Ct. 512, the court held valid regulations of the Department of the Interior, which required agents of that department charged with the suppression of the liquor traffic among the Indians, to advise and inform the Commissioner of Indian Affairs concerning all matters connected with the punishment of persons who had violated the liquor statutes, and also inform and advise the commissioner whether the suppression of the liquor traffic among the Indians would be furthered by executive or judicial clemency. Two of the defendants, Brents and Van Wert, were special agents of the kind just mentioned. Birdsall was an attorney for some persons who had pleaded guilty to unlawfully selling liquor to Indians. They had made application for clemency. At that point, according to the indictment, Birdsall gave money to Brents and Van Wert in order to influence them to make favorable recommendations. The district court held that the acts described in the indictment did not fall within the condemnation of any statute, and that the Secretary of the Interior was without authority to establish the regulations above mentioned. In sustaining the regu-

lations, and in holding that their violation was the equivalent of a violation of a statute, the Federal Supreme Court said that it was not even necessary that the regulations should be in written form. It pointed out that the regulations were in furtherance of the legislation which had created the office of the Commissioner of Indian Affairs, and then stated:

"For this reason, if for no other, it was within the competency of the office to establish regulations, and practices having the force of regulations, that all persons employed in its work would render to the commissioner whenever requested true reports and give disinterested and honest advice."

In *United States v. Morehead*, 243 U. S. 607, 61 L. Ed. 926, 37 S. Ct. 458, the defendant, who had been convicted of perjury upon an indictment which charged that he submitted a false affidavit when making an application for public lands under the Homestead Law, sought a reversal because no statute required an entryman to submit such an affidavit. The requirement was a regulation promulgated by the Commissioner of the General Land Office. The decision pointed out that the purpose of requiring the affidavit was to overcome the evil of using soldiers to make entries for the purpose of enabling an agent to sell the relinquishment. The decision sustained the regulation.

In *Williams v. Commissioner of Internal Revenue*, 44 Fed. (2d) 467, the court sustained the validity of a regulation of the Treasury Department which provided:

"In the case of property acquired by bequest, devise or inheritance, its value is appraised for the purpose of the Federal Estate tax, or, in the case of estates not subject to that tax, its value as appraised in the

State for the purpose of State inheritance tax shall be deemed to be its fair market value when acquired."

The taxpayer in that case had acquired some stock by devise which the Commissioner of Internal Revenue had appraised, under the rule just mentioned, at the same valuation as the probate court. The taxpayer then filed a petition for review of the appraisal. In sustaining the regulation and the valuation, the court said:

"These regulations have the force and effect of law when not in conflict with statutory provision on the same subject-matter."

The court fortified the statement by citation to numerous authorities all of which we have examined. They sustain the statement and illustrate the application of the principle in several cases. One of the authorities cited in the decision just reviewed was *Daeuffer-Lieberman Brewing Company v. United States*, 36 Fed. (2d) 568, in which the respondent brewing company, charged with the maintenance of a common nuisance, relied upon its brewing permit. There had been found upon its premises kegs and other receptacles holding beer containing more than one-half of one per cent of alcohol. The district court, in sustaining the government's suit, had depended upon a regulation of a federal department entrusted with the enforcement of the prohibition laws which provided that beer "containing one-half of one per cent or more of alcohol by volume may not be placed or stored in * * * portable containers on the premises where cereal beverages are made." In sustaining the district court, the Circuit Court of Appeals said concerning that regulation: "It has the force and effect of law."

The following language which we have taken from *Maryland Casualty Co. v. United States*, 251 U. S. 342, 64 L. Ed. 297, 40 S. Ct. 155, is much quoted:

"It is settled by many recent decisions of this court that a regulation by a department of government, addressed to and reasonably adapted to the enforcement of an act of Congress, the administration of which is confided to such department, has the force and effect of law if it be not in conflict with express statutory provision."

In the earlier decision of *Caha v. United States*, 152 U. S. 211, 38 L. Ed. 415, 14 S. Ct. 513, the court thus stated the rule:

"Questions of a kindred nature have been frequently presented, and it may be laid down as a general rule, deducible from the cases, that wherever, by the express language of any act of Congress, power is entrusted to either of the principal departments of government to prescribe rules and regulations for the transaction of business in which the public is interested, and in respect to which they have a right to participate, and by which they are to be controlled, the rules and regulations prescribed in pursuance of such authority become a mass of that body of public records of which the courts take judicial notice."

We could greatly extend these quotations and citations, but shall close by now quoting from *Maresca v. United States*, 277 Fed. 727:

"The regulation was promulgated by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury. Importance is attached, by counsel for defendants, to the fact that the President himself did not make or proclaim the regulation, and that it does not appear that he authorized either of the officials named to exercise the power delegated to him. The law is established that the President may

exercise through the heads of departments the powers vested in him. He speaks and acts through the heads of the several departments in relation to subjects which pertain to their respective duties. Wilcox v. Jackson Ex dem. McConnel, 13 Pet. 498, 10 L. Ed. 264; Wolsey v. Chapman, 101 U. S. 755, 25 L. Ed. 915. And it must be presumed as matter of law that the Secretary of the Treasury, acting over his own signature, does so by direction of the President. In United States v. Fletcher, 148 U. S. 84, 13 Sup. Ct. 552, 37 L. Ed. 378, the President was required to act in the matter of controversy in a judicial capacity under the Articles of War in approving a report of a courtmartial, and it appeared that the Secretary of War had acted in the matter over his own signature. The court held that it must be presumed that he acted by direction of the President in so doing. And in Porter v. Coble, 246 Fed. 244, 249, 158 C. C. A. 404, a postmaster who had been removed from office by the Postmaster General claimed that the power of removal was in the President, and that there was nothing to show that the man had been removed by the President or that the Postmaster General had ever been authorized by the President to make the removal. It was held that it must be presumed that the Postmaster General in ordering the removal acted by direction of the President. So it may be that the act of the Secretary of the Treasury in promulgating the regulation was the act of the President in the matter under consideration.''

As we have shown, the Appropriation Act expressly authorized the President—or, if we may employ a different term having the same meaning, the executive department of the government—to prescribe whatever rules and regulations were necessary to carry into effect the purpose of the act. When the Appropriation Act said ''The President shall require to be paid such rates of pay   *   *   *   '' it did not, in our opinion, demand that the President should personally act, but that

either he or some other member of the executive department of which he is the head should perform those duties. The act itself announces its purpose as being: "To provide relief, work relief, and to increase employment by providing for useful projects." The act certainly concerned a matter of public interest. In September, 1935, 14,213,522 persons were receiving relief from the federal government (October, 1935, Report of the Federal Emergency Relief Administration). Their welfare and the efforts which were being made by the government to provide them with employment in the construction of highways and other public improvements were matters of concern not only to those who, unfortunately, had been unable to find employment, but also to every American citizen. Virtually everyone was interested in the plight of the unemployed, and those whose interest was not prompted by humanitarian motives, nevertheless, found that the billions appropriated for relief was a matter of deep concern to them. We are satisfied that the two executive orders of the President had the same effect as if they had been incorporated in the appropriation resolution itself. But those two orders did not fix the wage rates of those who would work on the projects contemplated by the resolution and the executive orders. The order of July 12 stated that the wage rates should conform to the standards fixed by the Bureau of Public Roads and should provide for a "minimum rate for unskilled labor, a minimum rate for labor intermediate grade, and a minimum for skilled labor." The quoted words are virtually those of the Congressional resolution, and it is evident, since wage rates are closely related to standards of living, that the order of the Bureau of Public Roads pertained to a matter of public interest. This

is especially evident when we consider the following peremptory language of the Appropriation Act: "The President shall require to be paid such rates of pay * * * as will in the discretion of the President accomplish the purposes of this joint Resolution." Those circumstances are persuasive that the Bureau did not intend that its regulations should be mere memoranda for its office files, but should be rules for public guidance. As we have seen, a division of the executive department, like the Bureau of Public Roads, is an arm of the executive, and, as the authorities hold, the President may act through such a department. Whenever he speaks or acts through any of the several departments the effect is the same as if he had spoken or acted in person. Under the circumstances, we are satisfied that the same effect attaches to the labor classifications and wage rates prescribed by the Bureau of Public Roads as if those classifications and wage rates had been actually incorporated in the President's executive orders.

Since we are satisfied, as we stated in the preceding paragraph, that the rules and regulations pronounced by the President and by the Bureau of Public Roads possessed the same effect as laws, and since ignorance of the law excuses no one, it follows that the wage claimants cannot excuse themselves by avowing ignorance of the rules. The effect is the same, we believe, as if those classifications and wage scales were a part of and incorporated in the Federal Emergency Relief Appropriation Act of 1935. It, therefore, follows that although it may be true, as the findings of the circuit court state, that the claimants had no actual knowledge of the terms of Leonard's contract, nevertheless, they must be dealt with as though they possessed knowl-

edge of the federal regulations. That being true, the premise upon which the circuit court found that the account had not been stated from time to time is absent.

Before coming to a conclusion upon the issue as to whether or not the account between Leonard and each of the claimants became stated each week, let us briefly review the evidence that bears upon that issue.

We quoted in a preceding paragraph the circuit court's findings which stated that "the claimants had no knowledge of the fact that defendant Leonard was required to classify and pay any laborer according to the classification set forth in his contract." That, of course, is not a finding that the claimants were ignorant of the aforementioned rules and regulations although possibly it was intended to so say. However, as we shall shortly show, at least one of the claimants admitted knowledge of the rules.

John Kaser, the relator, was assigned to this project by the local public employment office. The contract required Leonard to obtain his workmen from that source. Before being assigned to the work Kaser had registered in that office. He registered upon a form entitled "Assignment Slip—Works Program" which states that it was printed in the United States Printing Office. The form bears various printed headings calling for information. Kaser gave the required information and the clerk in the office typed it upon the form in the appropriate places. Near the bottom is the following line: "I hereby certify that I am the person named above as employee." At that place Kaser signed his name. One of the entries upon the form states that Kaser would work as a laborer and that the rate of his pay would be 50 cents an hour. Kaser had had a similar slip when he was assigned work upon another

project, and admitted that he knew that the assignment slips expressed the rate of pay. When Leonard asked the employment office to send men to the job he asked for laborers only. At that time a copy of Kaser's assignment slip was delivered to him and it constituted his authority to go to work on this job. In this manner Kaser entered Leonard's employ, the time being the latter part of September, 1935.

According to Leonard's payroll, Kaser performed the following work and received the following pay:

| 1935 Week ending | Classification | Hours | Rate | Total |
|---|---|---|---|---|
| September 28 | Swamper | 40 | $.50 | $20.00 |
| October 5 | Carpenter's helper | 40 | .50 | 20.00 |
| October 12 | Mucker | 40 | .50 | 20.00 |
| October 19 | Mucker | 40 | .50 | 20.00 |
| October 26 | Mucker | 40 | .55 | 22.00 |
| November 2 | Mucker | 35 | .55 | 19.25 |
| November 9 | Mucker | 20 | .50 | 10.00 |
| November 9 | Powder man (light rock) | 20 | .75 | 15.00 |
| November 16 | Powder man (light rock) | 20 | .75 | 15.00 |
| November 16 | Mucker | 20 | .50 | 10.00 |
| November 23 | Powder man (light rock) | 20 | .75 | 15.00 |
| November 23 | Mucker | 20 | .50 | 10.00 |
| November 30 | Powder man (light rock) | 11 | .75 | 8.25 |
| November 30 | Mucker | 11 | .50 | 5.50 |
| December 7 | Powder man (light rock) | 20 | .75 | 15.00 |
| December 7 | Mucker | 20 | .50 | 10.00 |
| December 14 | Powder man (light rock) | 7 | .75 | 5.25 |
| December 14 | Mucker | 8 | .50 | 4.00 |

Whenever Kaser's time was split between two grades of labor as for instance for the week ending November 30 he received two checks. One represented the pay he had earned for unskilled labor and the other the wages he had earned in intermediate labor. Kaser swore that after the first week he worked as a rough

carpenter and should have been paid 75 cents an hour. According to his own testimony his work as a rough carpenter consisted of the following: "Well, just helping unload lumber, putting out that water pipe, carrying lumber around, that was the most, practically all we done that week." He was then asked: "You didn't use any tools?" and answered "Oh no, not a great deal, helped a little pulling nails out of the old lumber." He admitted that he had had virtually no experience as a carpenter. Apart from that work and two days spent in helping to haul rock, he swore that the remainder of his time up to February 15, 1936, was spent in work as a powder man. Thus he claimed that between September 30, 1935, and February 15, 1936, he performed 357 hours as a powder man in heavy rock for which his complaint sought $1.20 per hour, and 354 hours as a powder man in miscellaneous materials and in light solid rock for which his complaint asked 75 cents per hour. The circuit court reduced his claim to 357 hours as a powder man in miscellaneous materials and in light solid rock. It awarded him 75 cents per hour or a total of $252.75, being $54.75 more than the defendant had paid him. The preceding schedule shows that Leonard paid Kaser 75 cents per hour for a total of 98 hours as a powder man in light rock for work performed between November 2 and December 14. Kaser swore that after the second week of his employment and until February 15, 1936, he received 55 cents per hour. He denied that he was ever told he was being paid for any work at the rate of 75 cents per hour. When he was shown some of the checks which he had received week by week he experienced difficulty in explaining how his wages could have been calculated upon a basis of 55 cents an hour. To avoid misunderstanding,

we add that he admitted receipt of all wages shown in the preceding tabulation. Leonard, of course, swore that those wages compensated Kaser for all work he had performed.

December 16, Kaser, according to his own testimony, accepted employment on this project from Leonard as a sub-foreman, and likewise, according to his own testimony, he was paid for his work as a sub-foreman at the rate of 62½ cents an hour. Accordingly his other claims (1) that he was paid only 55 cents an hour up to February 15, and (2) that his work as a powder man continued up to February 15, must be disregarded. The crew, of which Kaser was sub-foreman, consisted of approximately 30 men who were engaged for the most part in clearing the ground for the construction crews which followed. One of the duties of a sub-foreman was to classify the work which the men in his crew were performing. To facilitate the classification by the sub-foremen, Leonard supplied them with a small printed form entitled Daily Time Card. Upon it were the headings Distribution, Hours and Rate. Upon it each man wrote his name and under the sub-headings entered a word descriptive of the work which he had done, the hours he had worked and the rate of pay. Having made these entries he presented the form to his sub-foreman for approval. The latter was manifested by the sub-foreman's signature. Thus, beginning with December 16, Kaser was classifying the work which his crew was performing. This circumstance is, of course, highly persuasive that he knew something concerning the required classifications and the rates of pay.

We shall now revert to the time before Kaser became a sub-foreman. Upon his daily time cards, in

the period which he now claims was devoted to work as a powder man, he never wrote that term upon any of them. Upon virtually all of his time cards he described the work that he was performing in that period as "culvert." Only two of his cards entered his rate of pay as 55 cents per hour; the rest gave the rate as 50 cents or left the space blank. On each Wednesday the men were paid the wages which they had earned in the preceding week. Kaser testified that he kept a daily record of his time and therefore knew on payday the hours which he had worked in the preceding week and the amount which he had earned. Leonard's timekeeper before making payment to the men showed them a form which he had devised and upon which he had entered the hours which they had worked, the amount which they had earned and other information. The form also contained space for the employee's signature which he signed concurrently with the receipt of his pay. A copy of one of these forms, containing entries made by the timekeeper follows:

Received payment in full for services for week indicated in second column:

| Check No. | Week Ending | Amount Earned | Deductions Board | Hospital | Hours Worked | Total Paid | Received |
|-----------|-------------|---------------|------------------|----------|--------------|------------|----------|
| 2393 | January | $22.50 | $3.00 | $2.00 | 10 | $5.50 | |
| 2407 | 4, 1936 | | | | 30 | 12.00 | |

Under the sub-title "Received" the employee wrote his signature after the receipt of his check.

Kaser testified that since he kept a record of his time he knew each week when he stepped forth to receive his pay how much was due. He also testified that whenever he believed that the timekeeper had made a mistake he discussed the matter with that official, and if it then developed that a mistake had been made the

error was corrected in the following week's check. For instance, he testified: "There was once or twice the timekeeper would make a little bit of difference, that is, forget something, and he carried it on to the next week, but outside of that my check was always right according to what wages I was getting; once or twice is all that there was ever any mistakes on my checks." In answer to other questions he made substantially the same answer. One of them follows: "Like I say, there was never no mistake when I began, outside of a time or two when there would be a week the payday would come right, there would be a mistake come on, that would be added the next week; that happened two or three times." Again he testified: "Every time there was a mistake we went over it right away." Referring to his signatures upon the payroll which we described, he said: "Like I say, I can't say to the amount, but if it hadn't been right, I wouldn't have signed it." We shall quote from him once more: "If it wasn't, the timekeeper and me always talked about whatever was the difference, it was always made up; I was always satisfied with my checks."

We gave the above review of the evidence concerning Kaser's claim only for the purpose of indicating whether or not his account became stated on pay day. For a similar purpose we shall now review briefly the facts concerning another claimant.

The second wage claimant to whom an award is made in the attacked judgment is Arthur E. Cook, a blacksmith. According to the complaint, Cook performed 1942 hours of labor in the period October 9, 1935, to August 29, 1936. The complaint alleges that 56 of those hours consisted of "holding drill" and the remainder was spent in doing the work of a journeyman blacksmith. The complaint avers that in this manner

Cook earned $2,291.20 and was paid $1,041.50. The findings of fact recite that between November 12, 1935, and August 20, 1936, Cook performed 1672 hours of work as a rough blacksmith for which he should have been paid 75 cents per hour or a total of $1,254. Further, the findings state that Cook was paid for the work he performed between those days $940.50. The judgment makes an award in his behalf of $313.50. His claim for holding the drill was disallowed.

According to Leonard's payroll, Cook worked as a mucker from October 6 to November 20, receiving pay at the rate of 50 cents per hour. Beginning November 12 and ending August 29, according to the payroll, Cook was credited each week with 10 hours work as a blacksmith and 30 hours as a mucker. For the former he was paid at the rate of 75 cents per hour, and for the latter 50 cents per hour. Thus, his weekly wage was $22.50.

The uncontradicted testimony shows that this job did not provide enough work to keep a blacksmith busy the entire day. Some days, due to no demand whatever upon the blacksmith's time, he did not fire his forge. Verne Larson was timekeeper on this job and one Ayer was superintendent. Larson testified: "I believe it was one time Mr. Ayer and myself took the matter up with him (Cook) and consulted with Mr. Cook for the time being in regard to the work he was performing at the job in regard to the blacksmith work; there wasn't enough work there to keep him entirely in the shop, that required him to either go outside or do something else beside that. At that time, if I remember right, I don't remember what the ailment was, it was either rupture or piles or something like that, and he asked that he just as soon stay right in the shop under the conditions if we would allow him to do it.

"Q. How much of the time was required there for him to do the blacksmithing? A. Oh, not very much, probably, possibly a couple of hours a day."

Further, according to Larson, Cook did not care to work in the open because he objected to the weather. This testimony given by Larson was not contradicted by anyone with the possible exception of the words "a couple of hours a day." When Cook's time was not occupied with his work as a blacksmith he helped in various capacities, sometimes loading wood on a truck, sometimes turning a grindstone, and at other times he was at liberty to idle his time according to his own pleasure. J. H. Scott was the resident engineer assigned by the State Highway Department to see to it that Leonard complied with his contract and abided by the labor classifications and wage rates. Testifying in regard to Cook and the other employees, he said that since they "were not held responsible for either quantity or quality" they were not entitled to the same classification as a workman from whom normal results were expected. Scott and others testified that the requirement of 239,000 man-hours of employment was an excessive demand to the extent of at least 50 per cent and that it induced Leonard to assign men to work which was mere tinkering. Another of the engineers swore: "It was a foolish law that you were fighting all the way through the system; some of the contractor's thought they would be money ahead to go out and hire men, anyone, and even let them sit on the banks." For that reason Leonard testified that he exacted of Cook no more than two hours of blacksmithing per week and agreed to pay him on the basis of ten hours blacksmithing per week and credit him with 30 hours unskilled labor per week, whether he

spent the 30 hours in idleness or otherwise. More than one of the men testified that normal results were not exacted of them. For instance, Cook, in explaining the situation, said: "I don't say I overworked." Although he claimed that he was wholly ignorant of the labor classifications and wage rates, he knew that one of the employees had sued Leonard, claiming that he had not been properly classified and had not been paid the required wages. Although he heard that the suit had been filed and later that a decision had been reached, Cook avowed ignorance of the outcome.

Cook swore that when he went to work in the blacksmith shop Leonard "told me I was to take care of the shop there and stay in the shop," but that Leonard said nothing about the pay. And he also swore that he asked no questions about the pay, adding, "I thought I would find out in time." When he received his first check after entering the blacksmith shop he was satisfied with its amount, so he said as a witness. He was paid week by week in the same manner as Kaser, and like Kaser signed upon the payroll each week admitting payment in full of the sums earned. Concerning, this, he testified: "I don't recall of having any checks at that time, but what were satisfactory," and added that had they not been satisfactory he would have mentioned the matter to the timekeeper. Further testifying, he swore: "I knew what my check would be, what was coming to me. I would take it, I didn't make any question about it." Again we quote: "Generally at the end of the week I knew what I was going to get. My check was satisfactory. I said nothing, I paid no attention to the rest of it so far as that is concerned. I knew what my check would be as soon as the check was handed to me, it was there, I signed for

it and go on about my business." Our last quotation from his testimony is the following: "I know I got my check and was satisfied at that time what was coming to me, whether it was in one check or two checks." His reference to the two checks arose out of the circumstances that one each week represented what he had earned as a blacksmith and the other was the amount earned as a mucker.

The third claimant for whom an award was made in the judgment is J. C. Douglas. According to the complaint, Douglas performed in the period September 9, 1935, to August 29, 1936, 1612 hours of labor. Of those hours 160 were spent in common labor and 1452 were devoted to the work of a rough carpenter. The complaint avers that in this manner Douglas earned $1,167 and that he was paid only $804. A judgment for him in the sum of $363 is demanded in the complaint.

Leonard's payroll indicates that Douglas performed the following labor and received the following pay:

| Time | Hours | Classification | Rate | Total |
|---|---|---|---|---|
| **1935** | | | | |
| September | 110 | Carpenter's helper | $.50 | $ 55.00 |
| October | 183 | do | .50 | 91.50 |
| November | 8 | Mucker | .50 | 4.00 |
| December | 110 | Swamper | .50 | 55.00 |
| **1936** | | | | |
| January | 176 | Swamper | .50 | 88.00 |
| February | 160 | do | .50 | 80.00 |
| March | 120 | do | .50 | 60.00 |
| April | 108 | Mucker | .50 | 54.00 |
| May | 128 | do | .50 | 64.00 |
| June | 164 | Swamper | .50 | 82.00 |
| July | 180 | Mucker | .50 | 90.00 |
| August | 165 | do | .50 | 82.50 |
| | 1612 | | | $806.00 |

The findings of fact state that between October 14, 1935, and July 11, 1936, Douglas performed 997 hours of work as a rough carpenter and that he should have been paid at the rate of 75 cents per hour or a total of $747.75 for that work. The findings declare that for this work he was paid only $498.50. The judgment entered a recovery in his favor for $249.25. For the sake of clarity we add that the findings declare that in addition to this work he performed some additional labor of an unskilled character.

Douglas claimed that he was an experienced journeyman carpenter, but we observe that in a period of several years immediately preceding his employment by Leonard he worked at carpentry only occasionally and those periods were of short duration. His principal employment in the past several years appears to have been as a helper in a grocery store, occasionally as a shingler, a longshoreman, a laborer, a choker setter in a logging camp, and finally in some undisclosed capacity in a sawmill. In order to obtain employment on this and other Works Progress projects he had registered at the public employment office. The first time he designated himself as a laborer; the second time headed the word "shingler." Immediately preceding his work for Leonard, Douglas worked on a P. W. A. project as a common laborer. In his work for Leonard his first two weeks were spent in wrecking old buildings. Then he and others were assigned for a while to the job of building the camp structures consisting of a cook house, bunk house, tent platforms, etc., all of a temporary character. The material that was used, so far as the record discloses, was the lumber salvaged from the wrecking operations in which the men worked for the first two weeks. In the period

while he was helping to build the camp structures he spent three days chopping wood for the cook house. About this time Douglas and another man built a dirt conveyor which, however, was never used. After the conveyor was completed Douglas was temporarily assigned to work, so he declared, "as pit man and oiler for the shovel." This work lasted for about two weeks and then he became the repair man around the camp. One of the engineers described his work in that capacity as mere tinkering which was intended to help run up the necesary number of man-hours. While working as a repair man he did some gardening for Leonard, for how many days he did not say. His last work on the job which continued for a month and a half was as "dump man on the fill."

Every day while he worked for Leonard he was required to prepare a daily time card of the kind which we have already mentioned. He admitted that he did not write upon any of them the word "carpentry" or its equivalent, and when asked why he did not do so if he was doing carpentry work, he answered, "I just couldn't say why I didn't." Frank L. Seward, who described himself as "the main carpenter on the job," was also a claimant. As a witness for himself and the other claimants, he described the buildings upon which Douglas had worked as follows: "There isn't a plumb building up there, not to my knowledge * * * that was a crude job there, it was merely temporary, they didn't care how it was as long as it housed the different things, it was going to be all torn down anyway." Although Seward swore that Douglas' work was that of a journeyman carpenter, he admitted that, as sub-foreman on the job, he daily classified Douglas' work while the camp buildings were being constructed as a

carpenter's helper. It will be recalled that the classifications which we have quoted classified a carpenter's helper as unskilled labor. Seward explained that he made that classification because the state engineer told him to do so.

Douglas claimed that he knew nothing about the required wage rates and labor classifications, but admitted that while he was working on the job he knew that one of the employees named Trent had an action pending against Leonard in which he claimed that Leonard was not paying the required wage. He also admitted that Leonard spoke to him about that case, asking him to be a witness for him (Leonard). Since he was a friend of Trent, and likewise deemed Leonard to be a friend, he declined to be a witness. His friend Seward, above mentioned, however, testified in the case. Douglas claimed that he did not ask Seward anything concerning the case or its outcome because "I just didn't figure it was anything to me."

Douglas was paid his wages in the same manner as Kaser and Cook, each time being presented with a statement similar to those we have described. He also signed his signature on the payroll sheet concurrently with his receipt of his check. He never expressed to his employer any dissatisfaction with any check that he had received.

We shall not review the evidence given by the other claimants because their testimony is substantially similar to that given by Kaser, Cook and Douglas. If the evidence above reviewed indicates that on pay day Kaser, Cook and Douglas stated their accounts with the defendant through the latter's timekeeper, then the accounts of the other claimants became stated in substantially the same manner. We, however, said that at

least one of the claimants expressly admitted that he knew of the labor classifications and the required wage rates. G. E. Blanchard, for instance, testified that he knew that carpenters on P. W. A. projects were entitled to receive 75 cents per hour for their labor. G. W. Daley, another claimant, testified that he became familiar with the required wage scale not later than November 15. Seward, whom we have already mentioned, attended the aforementioned Trent trial for three days and said that at the completion of that trial he knew the wage scale. Seward also testified that from the beginning of the project wages was the most common subject of discussion among the men. Ray Webber, labor relations engineer of the State Highway Commission, as a witness for the defendants, gave the following uncontradicted testimony concerning the employees on this project and their knowledge of the wage rates: "I would think that they did know, yes; I wouldn't say for sure. I have found on other jobs that the laborers know more about the provisions than some who were right close with them, with the one point in mind, to try and get into a classification after a job is completed to entitle them to more money."

The preceding review of the evidence has been made, not for the purpose of departing from the circuit court's findings but to show what took place on pay day and to indicate the extent of knowledge, whether complete or otherwise, which the men actually possessed concerning wage rates and labor classifications.

An account stated is formed in the following manner, according to the Restatement of the Law, Contracts, § 422:

"Matured debts are discharged by a manifestation of assent in good faith by debtor and creditor to a

stated sum as an accurate computation of the amount of the matured debt or debts due the creditor, or if there are cross demands  *  *  *. A new duty arises to pay a sum so fixed."

"Comment: (b)" which follows the above says:

"The validity of an account stated does not depend upon any uncertainty as to the existence or amount of the antecedent claims since the stated sum is supposed to be fixed, primarily, by way of computation rather than compromise."

Subdivision (c) of the Comment says:

"It is not essential that an account shall be stated in a particular form. Any evidence indicating assent by a debtor to his creditor that a stated amount is that due the creditor is ground for implying a promise by the debtor.  *  *  *"

From 1 C. J. S., Account Stated, § 1, we take the following:

"An account stated is an agreement between parties who have had previous transactions of a monetary character that all items of the account representing such transactions, and the balance struck are correct, together with a promise express or implied for the payment of such balance."

This court has defined an account stated in substantially the same manner as the two above authorities. Thus, Mr. Justice HARRIS, in *Steinmetz v. Grennon*, 106 Or. 625, 212 P. 532, gave the following definition:

"An account stated is an agreement between persons who have had previous transactions of a monetary character fixing the amount due in respect to such transactions and promising payment."

The claimants and Leonard each week had monetary transactions. The claimants supplied Leonard with labor and he furnished them with board, com-

missary and hospital service. On the Wednesday following the preceding week's transactions Leonard's timekeeper displayed to the men a statement of the account which, of course, invariably showed a balance due the men. The transactions had been simple and the purpose of the meeting on pay day was not merely to hand the men a check, but to satisfy them that the check represented the true amount that was owing and to make corrections whenever an error was discovered. The purpose of requiring the men to sign the payroll under the caption "Received payment in full for week indicated in second column below" was to close the account. The aforementioned rules of the Bureau of Public Roads expressly required Leonard to pay his men weekly and to send copies of his payroll, supported by the affidavit of his timekeeper or bookkeeper, to the State Highway Commission. Hence, accuracy was necessary, and a good means of achieving it was the method adopted which we have just described. If any employee believed that the statement tendered contained any error he then spoke up. Some of the men kept a memorandum of their time and this helped them to check more effectively the timekeeper's record. But all of them, regardless of the method they employed, swore that they were satisfied with the checks they received weekly.

The circuit court's finding is in harmony with the statements made in the preceding paragraph, but holds that an account stated was not effected because the men had no knowledge of the terms of Leonard's contract. As we have already said, that finding does not amount to a statement that the men were ignorant of the rules and regulations prescribed by the Federal Bureau of

Public Roads and incorporated in the President's executive order by express reference. But whether they had read those regulations or not, nevertheless, the authorities reviewed in preceding paragraphs render it impossible for them to plead ignorance.

█ It follows from the above that each week the account for the preceding week's labor was stated. The sum thus found due was paid and the claimants acknowledged its receipt. That disposed of the matter. By so holding we certainly do not mean to say that when public policy intends, as in the present instance, that a prescribed wage shall be paid so as to maintain living standards, a less sum can legally be accepted. But we do mean that on pay day the parties settled the classifications, and that since the wages applicable to those classifications were fully paid the matter was thereby ended. Our purpose in reviewing the evidence was to show that from day to day as the project was in progress the work which was being performed was not so well defined that it demanded classification in this specific category and rejection from all others. The amount paid to the workmen was in keeping with the classifications which they had entered upon their daily time cards. Those entries were made voluntarily and none of the claimants spoke to any of the numerous state engineers and other public inspectors who supervised the operations and claimed that they were being improperly classified. Those being the facts, we believe, as already stated, that on pay day the account became stated followed by payment in full of the stated account. Such being our opinion, the judgment entered was erroneous. Judgment for the defendants should be entered. The cause is remanded for that purpose.

RAND, C. J., and BELT and LUSK, JJ., concur.

KELLY, J., dissenting.

BEAN, J., not sitting.

BAILEY, J., took no part in the decision of this case.

Argued February 27; reversed May 14; rehearing denied
June 18, 1940

STATE EX REL. DALEY v. LEONARD ET AL.

(102 P. (2d) 213)

In Banc.

JOSEPH H. PAGE, Judge pro tempore.

*Wilber Henderson,* of Portland, for appellants.

*H. T. Botts,* of Tillamook, for respondent.

ROSSMAN, J. This is a companion case to *State of Oregon ex rel. John Kaser v. Charles H. Leonard et al.,* this day decided. Although this case was tried separately from the one just mentioned, nevertheless, the issues in it were substantially the same as in the other. At the conclusion of the trial, judgment was entered in favor of the plaintiff. After appeals had been taken in this and the other case the parties stipulated that the briefs submitted in the Kaser case should serve in this one also. The stipulation does not claim that the legal principles applicable to the one case are inapplicable to the other. We have read the transcript of the evidence filed in both cases, and have also examined the numerous exhibits accompanying the transcript. We are satisfied, for the reasons stated in the Kaser decision, that error was committed when judgment was entered for the plaintiffs. In our opinion, the accounts between the parties were stated each week fol-